# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-KA-01491-COA

**GLEN JOSEPH DAVIS A/K/A GLEN DAVIS**                                   APPELLANT

**v.**

**STATE OF MISSISSIPPI**                                                           APPELLEE

DATE OF JUDGMENT:                08/18/2015
TRIAL JUDGE:                          HON. LISA P. DODSON
COURT FROM WHICH APPEALED:    HANCOCK COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          OFFICE OF STATE PUBLIC DEFENDER
                                     BY: W. DANIEL HINCHCLIFF
ATTORNEY FOR APPELLEE:            OFFICE OF THE ATTORNEY GENERAL
                                     BY: BILLY L. GORE
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                      AFFIRMED - 10/03/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE GRIFFIS, P.J., CARLTON, WILSON AND GREENLEE, JJ.

### WILSON, J., FOR THE COURT:

¶1.     A Hancock County jury convicted Glen Joseph Davis of murder, and the circuit court sentenced him as a habitual offender to life in prison without eligibility for parole or early release.  Davis's appointed appellate counsel filed a brief pursuant to *Lindsey v. State*, 939 So. 2d 743 (Miss. 2005), certifying that he had examined the record thoroughly and could identify no arguable issues for appeal.  Davis subsequently filed a pro se brief in which he argues, among other things, that his trial counsel provided ineffective assistance by failing to disclose a witness, which resulted in the exclusion of the witness's testimony.  We address this issue and Davis's other claims below.  Based on our independent review of the record,

we conclude that there are no issues that warrant reversal. Therefore, we affirm. We also conclude that Davis's ineffective assistance claim cannot be decided on the record on appeal. Therefore, we dismiss that claim without prejudice. He may raise such a claim in a properly filed motion for post-conviction relief.

## FACTS AND PROCEDURAL HISTORY

¶2. On March 8, 2012, eighty-three-year-old Maurice Colly was found dead in the trunk of his car in the garage of his Bay St. Louis home. Colly's wrists and ankles were bound, his head was wrapped in a pillow case, plastic bag, and painter's cloth, and he had sustained blunt-force injuries to his face, scalp, and shoulders.

¶3. Davis was identified as a suspect in the homicide. He was arrested in Michigan after the case was featured on the television show *America's Most Wanted*. He was indicted for the murder, and his case proceeded to a seven-day jury trial in the Hancock County Circuit Court. Twenty-nine witnesses testified at trial, and over one hundred exhibits were admitted into evidence.

¶4. We begin by summarizing the State's case against Davis. We then discuss Davis's defense. Through his own testimony and other evidence, Davis attempted to offer an innocent explanation for the circumstantial evidence against him[1] and to shift suspicion to

---

[1] At the charge conference, the State initially agreed that this was a circumstantial evidence case. However, the State then reversed its position and argued that some of the physical and DNA evidence and certain post-arrest statements by Davis constituted "direct evidence." The trial judge ultimately ruled for Davis on this issue and granted circumstantial evidence instructions.

2

two other one-time suspects in the murder, Otis Stewart and Carol Babb.

***The State's Case***

¶5.     In March 2012, Colly owned and lived in a two-story building on Second Street in downtown Bay St. Louis. Colly's residence, where he lived alone, occupied the entire second floor of the building. The ground floor of the building consisted of three two-bedroom apartments, which Colly rented to tenants, and a garage, which was connected by interior stairs to Colly's residence. The garage could not be accessed from any of the first-floor apartments. Colly was eighty-three years old and a bachelor. His closest living relative was his nephew, Wally, who lived in Atlanta.

¶6.     On Wednesday, March 7, 2012, around 11 a.m., a friend of Colly's, Charlotte Taylor, called the landline telephone at Colly's apartment. Someone with a nasally voice answered, said that he did not feel like talking, and hung up. Taylor testified that the person did not sound like Colly, but at that point she had no reason to doubt that it was Colly, and she thought that he might just be sick and not feeling well. Taylor called Colly's phone several more times that day with no answer.

¶7.     Colly still did not answer when Taylor called again the next morning (March 8), so she drove to his home to check on him. No one answered when she knocked on the door around 10:30 a.m., so she talked to one of Colly's neighbors and then called Colly's nephew, Wally. Wally suggested that she call Colly's cell phone, which, according to Taylor, Colly rarely used. Taylor was surprised when "a strange voice answered" Colly's phone. The

3

person said, "we're going after the plants," and then hung up. Taylor thought that "the plants" might have been a reference to some landscaping that Colly had planned for his yard. However, by this point, she and the neighbor were very concerned and soon called the police.

¶8. Officers from the Bay St. Louis Police Department arrived and conducted a welfare check of Colly's home. Officer Scott Armentrout recognized Colly's green Toyota Camry because it was the same car that he had seen parked at a nearby library at 6:30 p.m. the night before. A caller had reported the car as "suspicious," so Armentrout had gone to the library to investigate. He found the car backed into a parking spot next to a garbage dumpster with its windows down and a dark-colored mountain bike on the backseat. Armentrout did not do anything else about the car that evening, but he noticed that it was still parked in the same place when he drove by the library around 3 a.m. When officers found the car parked in Colly's garage, its windows were up and the bicycle was gone.

¶9. Officers also noticed that a display case in Colly's living room was empty. Taylor told them that Colly kept a collection of plates depicting the Ten Commandments in the case. She later testified that Colly was very proud of the plates and never would have given them away.

¶10. The police eventually discovered Colly's body in the trunk of his car. Colly's wrists and ankles were bound, his head was wrapped in a pillow case, plastic bag, and painter's cloth, and he had sustained blunt-force injuries to his face, scalp, and shoulders. An autopsy determined that the causes of death were those injuries and asphyxiation. The state medical examiner testified that autopsy findings suggested that Colly died about forty-eight hours

4

before his body was found—i.e., on or about March 6, 2012—although the medical examiner stated that this estimate was "not exact."

¶11. During their investigation, police determined that Colly had spoken to an employee at a doctor's office on the morning of Monday, March 5. The employee called Colly to confirm his appointment for the next day. She knew Colly and was familiar with his voice, and she was certain that she spoke with him that morning. In addition, records from Hancock Bank show that a deposit was made in Colly's bank account that morning.

¶12. Colly did not show up at his doctor's appointment at 10:00 a.m. on Tuesday, March 6. An employee of Hancock Bank testified that the bank received two phone calls requesting increases on the limits on Colly's ATM card. These calls were made on March 5 and March 6, although the record does not establish what times on those dates the calls were made.

¶13. Police obtained Colly's bank records and reviewed transactions around the time of his death and after his death. On March 6, at 10:12 a.m., 10:13 a.m., and 10:14 a.m., someone used the drive-thru ATM at Hancock Bank in Bay St. Louis to make successive withdrawals of $500, $500, and $400 from Colly's account. Video and still photos from a camera at the bank show that the person was driving a car like Colly's light green Toyota Camry. The driver appeared to be wearing a blue shirt with a white floral design and possibly a Panama Jack-style hat, but the car's sun visor was positioned so as to obscure the driver's face. At 10:21 a.m. and 10:22 a.m., someone attempted to use Colly's Keesler Federal Credit Union ATM card to make a withdrawal at Hancock Bank. And at 10:29 a.m., someone attempted

5

to use Colly's Keesler card at an ATM at the People's Bank in Bay St. Louis. The attempts to use the Keesler card were all unsuccessful. Photos taken at the People's Bank appear to show the same car, but the sun visor was again positioned so as to obscure the driver's face. As discussed in more detail below, Colly's Hancock Bank card was used once more on March 9, 2012, at 2:37 a.m., to withdraw $400 from a drive-thru ATM in Gulfport. Video showed a different car, a silver Honda Accord. The car's sun visor was again positioned to obscure the driver's face.

¶14. After Colly's body was discovered, the police and the Mississippi Bureau of Investigation collected various evidence from the garage and residence, which we will discuss below. The police then turned the home over to Wally and his wife, Carol. Wally later noticed that a rectangular hole had been cut in the bottom of the exterior door to a storage room that was connected to Colly's garage. The cut-out piece had been taped back into the door from the inside. Wally showed the hole to Detective Gary Hudgens of the Bay St. Louis Police Department, and they found a cigarette butt in the storage room about three feet from the hole. Hudgens suspected that the hole was the murderer's point of entry into Colly's home.

¶15. In late April, in the course of cleaning Colly's home, Carol found a plastic Kmart bag behind the living room sofa. The bag contained medical tape, ace bandages, one blue glove, and gauze. The bag also contained a receipt showing a purchase of medical tape and bandages at 6:25 p.m. on March 7, 2012, at the Kmart on Highway 90 in Waveland. Carol

6

knew that Colly was dead by March 7, so she and Wally turned the bag over to Detective Hudgens. Detective Hudgens collected the bag and its contents as evidence, along with some cleaning rags, Lysol, and mineral spirits that were found near the bag. Wally and Carol also found an empty package for a salt-and-pepper wig in the living room, which they also turned over to police.

¶16.    Kmart provided video footage of the transaction reflected in the receipt, and on April 27, 2012, the police released the video to the media, describing the customer as a person of interest in Colly's murder. The same day, multiple callers to Crime Stoppers identified Davis as the customer in the video. The cashier then identified Davis in a photo lineup. At trial, she testified that Davis seemed "nervous" while making the purchase.

¶17.    At trial, four women—Jo, Jodi, Rene, and Lori—who met Davis on a dating website ("Plenty of Fish") testified about his whereabouts and actions in March and April 2012, beginning around the time of the murder. Jo testified that Davis called her around 9 p.m. on Monday, March 5, 2012, and asked her to pick him up at an Exxon station on Nicholson Avenue in Waveland. Jo picked up Davis, and they went back to her house in Waveland and then to a casino. According to Jo, they left the casino and returned to her house around midnight. She testified that around 2 a.m., Davis borrowed her car to go buy beer. She said that when Davis returned to her house around 3 a.m., she asked him why he had been gone so long, and he said that he had been talking to a friend. Jo then went to bed alone.

¶18.    Jo testified that she next saw Davis for "a brief period of time" around 8 or 9 a.m. on

March 6.[2] Jo did not see Davis again until she returned home from work at 11 p.m. that night. She testified that Davis left her house at some point that morning, but she did not know when he left, where he went during the day, or when he returned to her house. As discussed above, someone used Colly's ATM cards at banks in Bay St. Louis beginning at 10:12 a.m. that morning. Davis's cell phone records, which were admitted into evidence without objection, show that his cell phone utilized the Perniciaro Lane cell tower, which is near downtown Bay St. Louis, at 1:41 p.m. that afternoon.

¶19. Davis spent the night at Jo's house again on March 6, but at trial Jo could not recall what time of day he left on March 7 or anything else that occurred on March 7. The State presented no direct evidence of Davis's whereabouts during the day on March 7 until he made the above-discussed purchase at the Kmart in Waveland at 6:25 p.m. Also, as noted above, Officer Armentrout testified that Colly's car was parked with its windows down and a bicycle in the backseat at the library in Bay St. Louis from sometime before 6:30 p.m. on March 7 until at least 3 a.m. on March 8.

¶20. Around noon on March 8, Davis made a series of phone calls to taxi services. His cell phone utilized the Marti Street tower in downtown Bay St. Louis for those calls. Around 4 p.m., his cell phone utilized a cell tower in Biloxi, and around 6 p.m., his cell phone utilized cell towers in Saucier and Gulfport. Jodi testified that on March 8 Davis texted her throughout the day asking her to meet him for a drink that evening. He continued to text her

---

[2] On cross-examination, Jo said that she drank coffee with Davis on her porch, possibly until 10:30 or 11 a.m.

after she got home from work, so she finally agreed to meet him between 7 and 8 p.m. at Michael's, a bar on Highway 49 in Gulfport.

¶21. Jodi testified that when she met Davis at Michael's, "[h]e was dressed a little different from his norm." He was wearing what she considered to be "an older gentleman's shirt and an older gentleman's hat that he wouldn't typically wear." She "picked on him about" his clothes, and "he got a little bit offended." After they had one drink at Michael's, Davis asked her to take him to Walmart to buy new clothes, and he bought a t-shirt and a baseball cap. Next, they went to the Days Inn on Highway 49 in Gulfport. Davis asked Jodi to go to the front desk to get the room, but he gave her cash to pay for it. Davis changed into his new clothes, and around 9:30 or 10 p.m., they went to the Island View casino in Gulfport. Davis bought drinks for Jodi, and she testified that Davis "had more money than he'd ever had [when they had] gone out." Davis and Jodi were at the Island View for about two hours.

¶22. From the Island View, Davis and Jodi went to Nate's Sports Bar on Highway 49 in Gulfport. At trial, Davis admitted that while he and Jodi were at Nate's, he left briefly in her car and drove to a nearby bank. At 2:37 a.m., he used Colly's ATM card to withdraw $400. The withdrawal was recorded on the bank's video camera. Jodi did not know that Davis left the bar and did not give him permission to use her car. Jodi explained that they met several of her friends at Nate's, and she did not keep track of Davis the entire time they were there. She testified that she and Davis left Nate's together around 3 a.m. on March 9 and returned to the Days Inn.

9

¶23.  The State did not present any further testimony about where Davis went or what he did on March 9, 2012.  Davis's cell phone records suggest that he was in Gulfport, as there were a number of calls placed from his phone between noon and 6:20 p.m. that utilized Gulfport cell towers.

¶24.  On the afternoon of March 10, 2012, Davis and Rene drove to New Orleans in Rene's car.  Rene testified that Davis did not have a car of his own at the time, so he relied on his bicycle, which was a dark color, or others for transportation.  Davis and Rene stayed in New Orleans only a brief time and returned to her house in Ocean Springs the same day.

¶25.  At some point in March 2012, Davis brought a number of silver-plated dishes, an ornamental knife, a pewter submarine, and other items to Rene's house.[3]  Rene helped polish some of the items.  Davis told her that he had inherited the items from his grandfather, and he left them at her house.  However, Wally testified that the items belonged to Colly.

¶26.  Around March 26 or 27, 2012, Davis called Lori and told her that he was at her apartment in Ocean Springs and that he had some things that he wanted to leave there.  Lori agreed, and Davis left a plastic storage bin and two cardboard boxes outside her apartment. When she later moved the bin and boxes, Lori noticed that they contained ornamental plates and a crystal vase, among other items.  At trial, Lori identified the plates as Colly's prized Ten Commandments plates, and she identified the vase as one that Wally testified belonged to Colly.

---

[3] Rene could not remember when in March this incident occurred.

¶27.     As discussed above, on April 27, 2012, police released the Kmart video to the media, and Davis was identified as the customer. The same day, Davis asked Jo if he could borrow her car to check on his father, who he said was injured. Jo agreed but asked Davis not to keep the car long. Davis never returned Jo's car or spoke to her again. Davis also called Lori and asked if he could retrieve his storage bin and boxes from her apartment. Lori testified that Davis "was in a hurry" when he came to her apartment and left quickly.

¶28.     Detective Hudgens learned that Davis had been staying at his father's house in Kiln. Davis's father, Larry, consented to a search of Davis's room, and Detective Hudgens collected a pair of Asics tennis shoes as evidence.[4] Jimmy Perdue, a forensic scientist at the Mississippi Crime Lab, determined that the shoes matched three footprints (one right and two left) on a large plastic sheet that was under Colly's body in the trunk of his car. Perdue testified that the footprints and the shoe were consistent with respect to "physical size, shape, outsole design, and some general wear characteristics."

¶29.     In August 2012, the United States Marshals Service received information that Davis was in Walker, Michigan, a suburb of Grand Rapids, where Davis had once lived. Law enforcement spotted Davis riding a bicycle and arrested him after a short chase. At the time of his arrest, Davis was wearing a salt-and-pepper wig.

¶30.     While in jail in Michigan, Davis received a call from a friend ("Sue"), which the local

---

[4] In his testimony at trial, Davis denied that the shoes were his. However, Hudgens testified that they were found in Davis's room and that Larry acknowledged that the shoes were Davis's.

11

sheriff's department recorded. Davis told Sue that he was "busted," that he was "in some hot water," and that he was "not innocent." Davis also complained that "everybody despised" Colly, but the media had "put him up on a pedestal."

¶31.  The local sheriff's department learned that Davis had abandoned Jo's car at an apartment complex in the city of Wyoming, Michigan, another suburb of Grand Rapids. The car's Mississippi license plate had been replaced with stolen Michigan plates. Colly's Ten Commandments plates, his ornamental knife, and other property belonging to Colly were all found hidden in the wheel well of the car.

¶32.  The State's case-in-chief also included expert testimony regarding the forensic analysis of several pieces of evidence collected at Colly's residence. First, Davis's middle fingerprint matched one of two latent fingerprints taken from the driver's doorhandle of Colly's car. Second, Davis's DNA was on the cigarette that Detective Hudgens found in the storage room near the hole in the door. Third, Davis's DNA was on the inside of a blue glove found in the Kmart bag. Colly was excluded as the source of other DNA found on the glove, and Davis and Colly were also excluded as sources of a small amount of blood on the glove, which was described as only a "weak indication of a presence of blood." Fourth, two different persons' DNA was found on the gauze and bandages found in the Kmart bag. Davis and his patrilineal relatives could not be excluded as a source of some of the DNA. Colly and his patrilineal relatives could not be excluded as a source of other DNA on the same gauze and bandages.

¶33.   Finally, Detective Hudgens also collected a shirt from Colly's closet with a pattern that appeared similar to the shirt worn by the person captured on video using Colly's ATM card on March 6.  Both Davis and Colly could not be excluded as contributors of DNA found on and inside the shirt.

### *Davis's Defense*

¶34.   We begin discussion of Davis's defense with Davis's own testimony.  Davis testified that he had known Colly since 2007, that he did odd jobs for him as a handyman, and that he "considered him a friend."  In November 2011, Davis and his father, Larry, were doing some work at a property next door to Colly's home, and Colly offered to let Davis borrow a ladder. Colly told Davis to move his (Colly's) car before attempting to remove the ladder from the garage, so Davis backed the car onto the driveway and drove it back into the garage after he was finished with the ladder.[5]

¶35.   Davis testified that he cut the hole in Colly's storage room door in February 2012.  He claimed that Colly asked him to cut the hole because Colly was considering installing a vent in the door.  Davis had ridden his bicycle to Colly's home, so he borrowed Colly's car to retrieve his Sawzall (a reciprocating saw) from his storage unit.  Davis testified that he had driven Colly's car with Colly's permission on a number of occasions.  After he finished cutting the hole, Davis used tape to replace the cut-out piece because Colly had not purchased a vent for the door yet.  Davis left the Sawzall at Colly's house, and at trial he

---

[5] Larry similarly testified that in November 2011 he and Davis borrowed Colly's ladder and Davis moved Colly's car.

13

pointed it out in a picture of Colly's garage. He also smoked a cigarette that day, so he was not surprised that a butt with his DNA on it was found in the storage room.

¶36. Davis testified that the same day he cut the hole in the storage room door, Colly hired him to put up some drywall and paint in Colly's residence and garage. Davis agreed to do the work for $480. Colly asked Davis to do the job between March 5 and March 12 because Colly planned to be out of town that week.

¶37. Davis testified that he next stopped by Colly's house on Saturday, March 3, 2012. Colly still did not have a vent for the door. Colly said that he would leave his ATM card for Davis in case Davis needed it to buy paint for the job. Colly also left a garage door opener in a planter outside of the garage for Davis to use to access the garage and residence.

¶38. Davis next testified about his whereabouts on Tuesday, March 6, 2012. He woke up at Jo's house in Waveland around 8:30 or 9 a.m. He then had coffee with Jo, worked on her lawnmower, and mowed her back yard. Davis claimed that he did not leave Jo's house until Larry picked him up there around 12:30 p.m. Davis and Larry drove back to Larry's house in Kiln, which was where Davis primarily lived at the time. Davis then borrowed Larry's truck to meet Oliver Cuevas for lunch in Bay St. Louis.[6]

¶39. Davis picked up Cuevas at Walmart, where Cuevas worked, and they ate lunch at KFC. After lunch, Davis drove Cuevas back to Walmart and dropped him off a few minutes

---

[6] Larry similarly testified that he picked Davis up in Waveland on March 6 and then allowed Davis to borrow his truck. Larry never provided this information to the police.

14

before 3 p.m.[7]  Davis then went to pay his cell phone bill and to get a new driver's license to replace one that he had lost.[8]  Around 5 p.m., Davis drove back to Larry's house in Kiln. He was at Larry's house for about an hour before he "headed to Hattiesburg to see a girl" (another woman he met on Plenty of Fish).  Just as Davis was arriving in Hattiesburg around 7 or 7:15 p.m., the woman called to cancel their date.  Davis ate at Wendy's, went to Home Depot, and then drove back to Jo's house in Waveland.  Davis arrived at Jo's house around 10:30 or 10:45 p.m., just before Jo got home from work around 11 p.m.

¶40.   Davis testified that on March 7 he again woke up at Jo's house around 8:30 or 9 a.m. and had coffee with her.  He then mowed her front yard, washed Larry's truck, and left about 12:30 p.m.  He drove to his storage unit for supplies to use at Colly's house.  While he was at the storage unit, he spilled a can of paint, and it took him over an hour to clean up the mess.  He then ate lunch at Subway.  "While [Davis] was at Subway, a friend [(Liz)] texted and wanted some cough medicine.  So [he] left to go look for some cough medicine at CVS or Walgreens."  Liz was "very particular" about her cough medicine—it had to be a specific brand, size, and flavor.  Neither CVS nor Walgreens had the right kind, so Davis drove to Rouses Market in Diamondhead, where he finally found it.  Davis then drove back to Larry's house in Kiln.  He arrived at Larry's around 4 p.m. and then mowed Larry's yard.

---

[7] Cuevas similarly testified that he ate lunch with Davis at KFC and was with him from approximately 1:45 p.m. to 2:50 p.m.  Cuevas never provided this information to the police.

[8] Davis introduced a printout from the Department of Public Safety website that appears to confirm that he obtained a new license on March 6.

15

¶41.    After he mowed Larry's yard, Davis drove back to Bay St. Louis and then went to Kmart in Waveland, where at 6:25 p.m. he made the purchase discussed above.  Davis testified that he bought bandages at Kmart to wrap old shoulder and elbow injuries that bothered him when he painted.  He also testified that the cashier asked him why he needed the bandages, and he made a joke referencing a *Seinfeld* episode in which the characters Kramer and Mickey got acting jobs portraying illnesses for medical students to diagnose.[9] According to Davis, the cashier did not get the joke.  However, the cashier testified that she did not remember him making a joke.  After leaving Kmart, Davis went back to his storage unit for more supplies and then drove to Colly's home to begin work.

¶42.    Davis testified that when he arrived at Colly's home around 7 p.m., the door from the garage to Colly's residence was open, lights were on upstairs, and he could hear a woman's voice and the television.  Davis put on gloves and wrapped his elbow and shoulder to start work.  But he decided to go upstairs first.  When he did, he saw a blonde woman whom he had seen at Colly's home once before.  Davis introduced himself and told the woman that he was there to paint.  At the time, Davis did not know the woman's name, but at trial he identified her from a photograph as Carol Babb.  Davis found it "odd" that Babb was in Colly's home when Colly was supposed to be out of town, and he felt that "[s]omething wasn't right."  Davis also saw a man with Babb.  At the time, Davis did not know the man's name, but at trial he identified him from a photograph as Otis Stewart.  Davis did not say

---

[9] *Seinfeld: The Burning* (NBC Television broadcast Mar. 19, 1988).

much to either Babb or Stewart. The situation was "awkward," so Davis went out to the balcony to smoke a cigarette and to decide what to do. Davis apparently left one of his gloves and his bandages in the Kmart bag in the living room.

¶43. While he was on the balcony, Davis "heard a door slam," and he thought that Stewart had departed. However, Babb was still inside. After waiting on the balcony about twenty minutes, Davis decided that he should leave. He went back downstairs to the garage. He took his cigarette butt with him, but he forgot to pick up the Kmart bag. Davis took Colly's ATM card from his Sawzall case, which was still in the garage. Davis testified that he did not have possession of the ATM card until he took it from the Sawzall case as he left Colly's house that evening.[10] Davis then closed the garage door and left in Larry's truck. Davis took Liz's cough medicine to her at her house in Bay St. Louis and then drove to Larry's house in Kiln. He arrived at Larry's house around 9 p.m. and spent the night there.

¶44. On March 8, Davis asked Larry to drive him back to Liz's house in Bay St. Louis, and Larry dropped him off there around noon. Davis testified that he needed to pick up "a shirt or something" at Liz's house. He only spoke to Liz for "[t]wo minutes," as "[s]he was in her bed on her back." He was at Liz's house for only five or ten minutes before he began trying to call a taxi because he "was going out" and "needed a ride." He eventually found a taxi, and the driver took him to the Island View.

¶45. Davis had lunch at the Island View. He texted Rene and asked her to meet him. She

---

[10] Davis denied that he used the card in the morning on March 6.

17

met him at the Island View around 1:30 p.m. but could only stay until 3 p.m. Rene then gave Davis a ride to the Hard Rock casino. Davis was at the Hard Rock only about ten minutes before he called another taxi. Davis explained that he was carrying his backpack, "which goes where [he] go[es]," but "they don't check bags" at the Hard Rock, so he could not stay for cocktails, as he had planned. The taxi dropped Davis off at Walmart on Highway 49, and he eventually walked to a Mexican restaurant while he waited for Jodi to get off of work.

¶46. Davis testified that he met Jodi at Michael's bar, and his account of the evening was generally consistent with Jodi's testimony—i.e., they went to the Days Inn, the Island View, Nate's, and eventually back to the Days Inn. *See supra* ¶¶20-22. Unlike Jodi, Davis did not testify that she took him to Walmart to buy new clothes. Davis acknowledged that while he and Jodi were at Nate's, he left briefly in Jodi's car and used Colly's ATM card to withdraw $400 from an ATM. Davis considered this prepayment for the drywall and painting job that he still intended to finish at Colly's home.

¶47. According to Davis, Jodi left around 8 a.m. the following morning (March 9), but he slept late. After he woke up, he went to the front desk and paid cash for another night. "And that night, [he] did it all over again with another girl"—namely, Rene. Davis testified that he met Rene around 9 p.m. at the Island View, and they stayed there "for a few hours" and "then hit the rest of the town." He testified that he and Rene "stayed up all night" together, presumably returning to the Days Inn at some point.

¶48. Davis testified that the next day—Saturday, March 10—he and Rene drove to her

house in Ocean Springs. Consistent with Rene's testimony, Davis testified that he and Rene drove to New Orleans in the afternoon but stayed only a short time before returning to Ocean Springs.[11] According to Davis, his father texted him while they were in New Orleans and told him that Colly was dead. This "upset" Davis because Colly was his "friend." Davis spent the rest of the weekend at Rene's house.

¶49.    The next week, Davis got a new phone and quit using his old phone. He was "freaking out" that he would be accused of the murder, but he did not go to the police to tell them about Babb and Stewart. As will be discussed in more detail below, Babb and Stewart were identified as suspects in the murder, and for a time Davis thought "everything would get worked out." From March 11 to April 27, Davis "picked up and carried on with [his] life" and tried to act as though everything was normal.

¶50.    Davis testified that his father or "somebody" texted him on April 27 and told him that he was on the news in connection with Colly's murder. Davis claimed that he borrowed Jo's car before he learned that the police were looking for him. He denied that he borrowed the car with the intent "to flee." He testified that he fled because he was wanted for questioning and because he "had some things of [Colly's]," including the Ten Commandments plates. Davis claimed that Colly had given him the plates and other items. He denied that he stole

---

[11] Rene did not testify that she met Davis at the Island View on March 8. Nor did she testify that she went to a casino, "hit the town," "stayed up all night," or stayed at the Days Inn with Davis on March 9-10, 2012. The State called Rene as a witness, and on cross-examination Davis questioned her about their trip to New Orleans on the afternoon of March 10. However, Davis did not question her about the time they allegedly spent together on March 8, March 9, or the morning of March 10.

anything from Colly. Davis claimed that other items found in his car did not belong to Colly and that Wally and Taylor were mistaken or lying when they testified otherwise.

¶51. Davis fled to Chattanooga, Tennessee, and then drove to Michigan, where he had grown up. At trial, Davis testified about the recorded phone conversation from the Michigan jail. He claimed that when he told "Sue" that he was "not innocent," he meant only that he "took a car" and "lied to get that car." Davis testified that he did not murder Colly. He admitted that his testimony at trial was the first time that he had disclosed his claim that he saw Stewart and Babb at Colly's house the night of March 7, 2012.

¶52. In support of his theory that Babb and/or Stewart murdered Colly, Davis called Sindi Rogers as a witness. Rogers managed the Manor House apartments, which were located behind Colly's residence and apartments. Babb and Stewart had separate apartments at the Manor House in March 2012. Rogers testified that Babb and Stewart broke their leases by moving out of their apartments without notice in March 2012. She also testified that both Babb and Stewart left behind personal property, including some clothes and furniture, and that Stewart typically rode a bicycle.

¶53. Davis also called Joe Kepfer, a former detective with the Bay St. Louis Police Department. Kepfer had been one of the lead investigators on the Colly murder, but his employment was terminated early in the investigation. Kepfer testified that he was fired after he was accused of making false statements in connection with applications for search warrants in this case. However, Kepfer denied making any false statements.

¶54. Kepfer initially considered Stewart and Babb the primary suspects in the murder. Kepfer testified that the "information [he] had was that [Babb and Stewart] moved out of their apartments without notice to the apartment manager in the middle of the night" on March 7-8. Stewart and Babb were detained in Louisiana on charges of credit card fraud, and Kepfer interviewed them in Louisiana. Kepfer and other officers working the case eventually concluded that Stewart and Babb were not involved in Colly's murder. Kepfer was not involved in or familiar with the any part of the investigation after his suspension from the police department, which occurred about two weeks after the murder.

¶55. One of Colly's downstairs tenants, Latonja Ervin, also testified as a defense witness. Ervin testified that on March 6, 2012, she was in front of the building about to leave for work when she saw Colly's car drive down the street and pull into Colly's garage. She thought that this occurred between 8:30 and 9 a.m., but she was not positive about the exact time. Ervin testified that the car pulled into the garage faster than normal. She also testified that the driver was wearing a green coat and hat, his arms were "straight out and stiff," and he did not return her waive, which was unusual. Ervin did not get a good look at the driver's face, so she was unsure whether Colly was driving. Ervin also thought that she saw a "shadow" in the car like there could have been another person in the car, but she was not sure.

¶56. Davis attempted to call one other witness—Paula Jacobson—in support of his theory that Babb and/or Stewart murdered Colly. However, as will be discussed in more detail below, the trial judge excluded Jacobson's testimony because Davis failed to disclose her as

a witness until well after the State had rested its case-in-chief. Defense counsel stated that his "only reason" for calling Jacobson was that she would testify that Babb knew Colly.

### *Verdict and Sentencing*

¶57. The jury deliberated for about two hours and returned a verdict finding Davis guilty of deliberate design murder. The court sentenced Davis as a habitual offender to life imprisonment without the possibility of parole or early release. Davis filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. The trial court denied the motion, and Davis then filed a timely notice of appeal.

## ANALYSIS

¶58. Davis's appointed appellate counsel filed a *Lindsey* brief, certifying that he had examined the record and had identified no arguable issues for appeal. *See Lindsey*, 939 So. 2d at 748 (¶18). Davis subsequently exercised his right to file a supplemental pro se brief. His pro se brief makes four arguments: (1) that his appellate counsel provided ineffective assistance; (2) that his trial counsel provided ineffective assistance by failing to include Jacobson on his witness list and by not objecting to Detective Hudgens's testimony, which Davis alleges was perjured; (3) that he "was deprived of a fair trial because of prosecutor misconduct," i.e., the use of Hudgens's allegedly perjured testimony and allegedly "inflammatory remarks" during closing argument; and (4) that he "was denied a fair trial because the trial judge failed to address false statements made by Detective Hudgens."

¶59. For clarity, we organize our discussion as follows: First, we address the exclusion of

Jacobson's testimony and Davis's related ineffective assistance claim. Second, we address

Davis's various claims that Detective Hudgens's testimony denied him a fair trial. Third, we

address Davis's claim that he was prejudiced by "inflammatory remarks" during closing

argument. Having "conducted an independent and thorough review of the record, . . . we

conclude that there are no issues that warrant reversal." *Taylor v. State*, 162 So. 3d 780, 787

(¶18) (Miss. 2015). We dismiss Davis's claim alleging ineffective assistance of trial counsel

without prejudice. He may raise that issue in a properly filed motion for post-conviction

relief. Finally, our thorough review of the record renders moot Davis's claim that he

received ineffective assistance of appellate counsel. *See Johnson v. State*, 191 So. 3d 732,

737 (¶17) (Miss. Ct. App. 2015).

## I.   Exclusion of Jacobson's Testimony

¶60.   Davis argues his trial counsel's failure to disclose Jacobson as a witness, which

resulted in the exclusion of her testimony, violated his constitutional right to the effective

assistance of counsel. We first address the trial judge's ruling precluding Jacobson from

testifying, and we find no abuse of discretion in that ruling.[12] We then address Davis's

ineffective assistance claim.

---

[12] We consider this issue arguable in light of recent decisions of the Supreme Court and this Court. *See Overton v. State*, 195 So. 3d 715 (Miss. 2016) (reversing for a new trial after finding that the trial court abused its discretion by excluding a defense witness as a sanction for a discovery violation); *Willard v. State*, 219 So. 3d 569, 574-76 (¶¶19-29) (Miss. Ct. App. 2017) (same). Therefore, pursuant to *Lindsey*, 939 So. 2d at 748 (¶18), we address the issue on our own motion. Because the law on this issue is straightforward, we conclude that supplemental briefing is unnecessary. *See id.* (stating that the appellate court should order supplemental briefing on "any arguable issue" "if the circumstances warrant").

### A. The Trial Judge's Ruling

¶61. After the State had rested and Davis's first three witnesses had testified, the trial judge became aware that Davis intended to call Jacobson as a witness. One of the jurors knew Jacobson and had talked to her while leaving the courthouse for lunch. The juror was surprised to learn that Jacobson was a witness, as she had not been identified as a potential witness during jury voir dire. The juror informed the court of the issue, which the court then raised with the parties.[13]

¶62. Davis's counsel represented that Jacobson would testify that she lived at the Manor House apartments in March 2012, that she knew Babb, and that Babb knew Colly. Counsel also stated that Jacobson would testify that Babb introduced her to Colly and that she "saw [Babb] going over to [Colly's] property several times." Counsel acknowledged that he had not listed Jacobson as a potential witness even though for "several months" he had intended to call her to testify. Counsel offered two justifications: First, Jacobson's name was mentioned in discovery provided to Davis by the State,[14] and counsel "didn't know that [he] had to vet [the State's] discovery for them." Second, counsel characterized Jacobson as a "rebuttal" witness, stating that she would rebut the State's "position that there was no link at all between . . . Colly and Babb."

---

[13] The juror was dismissed at the State's request. Davis did not object.

[14] Counsel for the State indicated that Babb mentioned Jacobson in a phone call that Babb made from jail, which was recorded and produced to the defense, and in an interview with police. The record does not reflect what Babb said about Jacobson.

¶63. Consistent with Uniform Rule of Circuit and County Court Practice 9.04(I),[15] the court granted the State an opportunity to interview Jacobson, after which the State argued that she should not be allowed to testify. The State acknowledged that exclusion was an "exceptional" remedy; however, the State argued it was an appropriate remedy because Davis's violation of Rule 9.04 was "willful" and because the State did not have Babb under subpoena or know where she was. The trial judge agreed and ruled that Jacobson would not be allowed to testify.

¶64. The trial judge's ruling was not an abuse of discretion.[16] Rule 9.04(C)(1) clearly required Davis to disclose the "[n]ames and addresses of *all* witnesses in chief which the defendant may offer at trial," together with a copy of any written or recorded statement "and the substance of any oral statements made by such witness." URCCC 9.04(C)(1) (emphasis added). The rule contains no exception for a witness who is referenced in materials that the State produced in discovery.

¶65. Nor was Davis's failure to disclose Jacobson justifiable on the theory that she was a

---

[15] The requirements and procedures of former Rule 9.04, which was in effect at the time of Davis's trial, are now found in Rule 17 of the Mississippi Rules of Criminal Procedure, which went into effect on July 1, 2017.

[16] "The standard applied for appellate review of a trial court's sanction for discovery abuses is 'whether the trial court abused its discretion in its decision.'" *Lipsey v. State*, 50 So. 3d 341, 346 (¶12) (Miss. Ct. App. 2010) (quoting *Gray v. State*, 799 So. 2d 53, 60 (¶26) (Miss. 2001)). "Upon weighing all relevant factors in the case, unless there is clear error in judgment as to the sanctions imposed for violation of the discovery rule, this Court will affirm the imposed sanction." *McGregory v. State*, 979 So. 2d 12, 17 (¶7) (Miss. Ct. App. 2008).

"rebuttal" witness. A defense witness is not a rebuttal witness just "because [her testimony] is given in answer to some of the testimony offered as part of the [the State's] case in chief." *Harris v. Gen. Host Corp.*, 503 So. 2d 795, 797 (Miss. 1986). If that were the case, "there would be no basis in principle for ever requiring the defendant to disclose in advance the evidence [he] would offer at trial, for all such defense evidence is in this sense rebuttal." *Id.* The Supreme Court has "effectively dispatched the 'rebuttal witness' ruse for non-disclosure of witnesses in the context of criminal cases." *Id.*; *see, e.g.*, *Coates v. State*, 495 So. 2d 464, 466 (Miss. 1986). Here, Davis's purpose in calling Jacobson to testify was to establish a link between Colly and Babb to support his theory of the case: that Babb and Stewart murdered Colly. Davis planned for "several months" to call Jacobson as a witness in his case-in-chief. Jacobson was not a rebuttal witness, and Davis violated Rule 9.04(C)(1) by failing to disclose her on his pretrial witness list. *See Coates*, 495 So. 2d at 466.

¶66.    In certain cases, a trial court has discretion to exclude a defense witness who was not disclosed to the State prior to trial. "[I]f 'the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence,' it [is] entirely appropriate to exclude the witness'[s] testimony." *De La Beckwith v. State*, 707 So. 2d 547, 575 (¶103) (Miss. 1997) (quoting *Taylor v. Illinois*, 484 U.S. 400, 415 (1988)); *accord Overton*, 195 So. 3d at 718 (¶10) ("[T]he record must contain evidence that the defendant committed a discovery violation to obtain a tactical advantage before exclusion becomes the appropriate sanction.").

26

¶67. Here, the record does contain evidence that the discovery violation was willful and that the defense did not disclose Jacobson in order "to obtain a tactical advantage." Defense counsel understood that Jacobson's testimony would be a surprise to the State. He simply stated that he did not think that he was required "to disclose the part of [the State's] investigation that [the State] didn't do." However, at least to the extent of disclosing the names of potential trial witnesses, that is what Rule 9.04 requires. Rule 9.04(C)(1) plainly required Davis to disclose *all* potential witnesses, and the State was entitled to rely on his disclosures. Counsel acknowledged that he had planned to call Jacobson for "several months," and his reasons for not disclosing her as a witness are not supported by any objectively reasonable interpretation of Rule 9.04. The record thus supports a finding that the violation was willful and that exclusion was an appropriate remedy.

¶68. Moreover, as noted above, Jacobson was not disclosed as a witness until after the State had rested its case-in-chief and Davis's defense was well underway. Indeed, Davis did not disclose Jacobson at all—a juror brought the issue to the court's attention. This extreme delay in her disclosure provides further support for the trial court's ruling. The State did not have Babb under subpoena and did not know where she was, making it impractical for the State to investigate Jacobson's proposed testimony or prepare any rebuttal. Both the Supreme Court and this Court have affirmed the exclusion of defense witnesses who were known to the defense well before trial but were not disclosed until after the prosecution rested its case-in-chief. *See De La Beckwith*, 707 So. 2d at 573-67 (¶¶95-106); *Pelletier v.*

27

*State*, 207 So. 3d 1263, 1268-71 (¶¶24-33) (Miss. Ct. App. 2016) (affirming by an evenly divided Court), *cert. granted*, 204 So. 3d 291, *cert. dismissed*, 2014-CT-00869 (Jan. 19, 2017).

¶69. Finally, on the present record we cannot conclude that Jacobson's exclusion prejudiced or harmed Davis's defense. *See, e.g.*, *Wilson v. State*, 156 So. 3d 808, 810 (¶5) (Miss. 2013) ("A conviction will not be reversed based on the improper exclusion of evidence unless the exclusion results in prejudice and harm." (quotation marks omitted)). Counsel represented to the court only that Jacobson would testify that Babb knew Colly and walked "to his property" on unspecified occasions. The record on appeal does not include any other detail about Jacobson's proposed testimony. There is no indication in the record on appeal that her testimony would have linked Babb or Stewart to the murder or provided any motive for either of them to have committed the murder. We cannot say that the exclusion of such limited testimony prejudiced or harmed Davis's defense.

## B. Ineffective Assistance Claim

¶70. In his pro se brief, Davis essentially concedes that his trial counsel committed a discovery violation when he failed to disclose Jacobson as a witness. He argues that this error constituted ineffective assistance of counsel and that he suffered prejudice because the error resulted in the exclusion of Jacobson's testimony.

¶71. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot

28

be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668 (1984). The defendant must show *both* (1) "that counsel's performance was deficient"—i.e., "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"—*and* (2) that he was prejudiced as a result—i.e., "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. Stated differently, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶72. "It is unusual for this Court to consider a claim of ineffective assistance of counsel when the claim is made on direct appeal" because "there is usually insufficient evidence within the record to evaluate the claim." *McClendon v. State*, 152 So. 3d 1189, 1191-92 (¶12) (Miss. Ct. App. 2014) (quoting *Aguilar v. State*, 847 So. 2d 871, 878 (¶17) (Miss. Ct. App. 2002)). Because an appellate court "is limited to the trial record on direct appeal, issues of ineffective assistance of counsel are more appropriate in a motion for post-conviction relief." *Sandlin v. State*, 156 So. 3d 813, 819 (¶20) (Miss. 2013). We may address ineffective assistance claims on direct appeal only if "the issues are based on facts fully apparent from the record," *id.*, or the "parties stipulate that the record is adequate," and we conclude that there is no need for the trial judge to make additional findings. *Read v. State*, 430 So. 2d 832, 841 (Miss. 1983). If the record on direct appeal is not sufficient to address

29

the claims, we will "dismiss the claims without prejudice, preserving the defendant's right to raise the claims later in a properly filed motion for post-conviction relief." *Sandlin*, 156 So. 3d at 819 (¶20).

¶73. In this case, the State does not stipulate that the record on direct appeal is adequate to address Davis's claim, and we agree that the claim should be dismissed without prejudice to Davis's right to raise the issue in a properly filed motion for post-conviction relief. Even if trial counsel's failure to disclose Jacobson satisfies the first prong of the *Strickland* test, the record on appeal does not demonstrate that Davis was prejudiced as a result—i.e., that the error was "so serious as to deprive [Davis] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 686. As discussed above, the only representations in the record are that Jacobson would have testified that Babb knew Colly and walked "to his property" on unspecified occasions. For the same reasons discussed just above, we cannot say that the exclusion of such limited testimony deprived Davis of a fair trial. Therefore, on the present record, Davis cannot satisfy the second prong of the *Strickland* test. And "[i]f either prong is not met, the claim fails." *Havard v. State*, 928 So. 2d 771, 781 (¶8) (Miss. 2006).

¶74. We recognize that Davis attached additional documents to his pro se appellate brief, and he argues that if Jacobson had been allowed to testify, she could have established a far more significant connection between Colly and Babb/Stewart. Among other documents, Davis attaches what purports to be a handwritten statement by Jacobson, signed and dated October 21, 2016, which was six months after Davis's appointed appellate counsel filed a

30

*Lindsey* brief. The page preceding the statement is notarized and purports to confirm that Jacobson signed the statement.

¶75.  The purported written statement from Jacobson makes a number of claims: Babb frequently went to Colly's home to clean for him. Babb said the job was "easy money" because it "never took her long to clean his house." Jacobson speculated that Babb was actually sleeping with Colly because she was never gone longer than "30-45 min. max" when she went to his home. Babb never told Stewart, her boyfriend, how much money Colly actually paid her because Stewart always took her money. Stewart pressured Babb to get more money from Colly, and one night Babb and Stewart both went to Colly's home to "get her money he owed her." Stewart sold drugs in his apartment and constantly talked about money. When Jacobson learned of Colly's murder, she told her mother that she thought that Stewart and Babb had killed him. Babb called Jacobson at work a few days after the murder to ask whether "anyone ha[d] asked about her." Babb then told Jacobson, "[I]f anyone asks anything about me[,] you haven't spoken to me." Jacobson subsequently listened to an unspecified phone call placed to a bank from someone posing as Colly. Jacobson was "100% sure" that the caller was Stewart.[17] Jacobson and Babb had been friends for many years, and Jacobson said she had no motive to implicate Babb in a murder.

¶76.  In addition to obvious hearsay and authenticity issues, the documents attached to

---

[17] It is unclear who would have played the recording for Jacobson. There was testimony at trial regarding two phone calls to Hancock Bank. However, no evidence was presented that either call was recorded.

31

Davis's brief are not part of the record in the circuit court or the record on appeal. As noted, some of these documents were created while this appeal has been pending. The law is clear that such documents cannot be considered on direct appeal. *See, e.g.*, *Harris v. State*, No. 2015-CA-01193-SCT, 2017 WL 58190, at *6 (¶30) (Miss. Jan. 5, 2017); *Hampton v. State*, 148 So. 3d 992, 995-96 (¶¶6-8) (Miss. 2014); *Stone v. State*, 94 So. 3d 1078, 1082 (¶11) (Miss. 2012). Therefore, any claim of ineffective assistance based on the allegations and arguments in Davis's pro se brief cannot be addressed on direct appeal. We dismiss this claim without prejudice to Davis's ability to pursue the claim in a properly filed motion for post-conviction relief. *Sandlin*, 156 So. 3d at 819 (¶20).[18]

## II. Detective Hudgens's Testimony

¶77. Davis claims that Detective Hudgens gave false testimony, and he argues that he is entitled to a new trial because his trial counsel failed to object to the testimony and failed to take other steps to expose or remedy the alleged perjury; because the prosecutors engaged in "misconduct" by making use of Hudgens's testimony; and because the trial judge failed to address the alleged perjury. These arguments are all without merit.

¶78. Davis's arguments focus in large part on Hudgens's testimony that he did not know why the original lead investigators on the case, Detective Kepfer and Detective John Mitchell, were removed from the case and dismissed from the police department.[19] When

---

[18] Davis may not file such a motion in the circuit court unless the Supreme Court first grants him leave to file. *See* Miss. Code Ann. § 99-39-7 (Rev. 2015).

[19] Detective Mitchell was later reinstated.

32

Hudgens was questioned further outside the presence of the jury, he testified that he understood that Kepfer and Mitchell were dismissed because of "poor judgment" in their investigation of Babb and Stewart, but he lacked firsthand knowledge of the reasons for the dismissals because he was not privy to the paperwork or any civil service hearing. The trial judge instructed Hudgens not to "play . . . games" and to answer questions directly, and she allowed Davis's counsel to question Hudgens further in the presence of the jury. This issue, various other alleged inconsistences in Hudgens's testimony, and questions about the investigation were all explored on cross-examination. These issues are without merit.

### III. Closing Argument

¶79.   In his pro se brief, Davis also argues that he is entitled to a new trial based on a long list of allegedly "inflammatory remarks" during closing argument. However, Davis did not object to any of these comments at trial. "Contemporaneous objections to allegedly erroneous comments of the prosecuting attorney in closing arguments must be made or the point is waived." *Gray v. State*, 487 So. 2d 1304, 1312 (Miss. 1986). In the absence of a contemporaneous objection, "the point may be considered" on appeal only "if the argument [was] so 'inflammatory' that the trial judge should have objected on his own motion." *Id.* (quoting *Griffin v. State*, 292 So. 2d 159, 163 (Miss. 1974)). None of the comments cited in Davis's appellate brief were so "inflammatory" as to require a new trial in the absence of a contemporaneous objection.

### CONCLUSION

33

¶80. After a thorough and independent review of the entire record, and after considering the issues raised in Davis's pro se brief, we conclude that there are no issues that warrant reversal. Therefore, we affirm Davis's conviction and sentence. Davis's claim alleging ineffective assistance of counsel is dismissed without prejudice. He may raise such a claim in a properly filed motion for post-conviction relief.

¶81. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, GREENLEE AND WESTBROOKS, JJ., CONCUR.**