# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-KA-01280-COA

KELVIN BELL A/K/A KELVIN LEVISE BELL                    APPELLANT

v.

STATE OF MISSISSIPPI                                                      APPELLEE

DATE OF JUDGMENT:                    09/08/2017
TRIAL JUDGE:                                 HON. M. JAMES CHANEY JR.
COURT FROM WHICH APPEALED:    WARREN COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:        FRANK G. VOLLOR
                                                   TRACIE  DIANE HERRING
ATTORNEYS FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL
                                                   BY: JOSEPH SCOTT HEMLEBEN
                                                          MATTHEW WYATT WALTON
DISTRICT ATTORNEY:                      RICHARD EARL SMITH JR.
NATURE OF THE CASE:                    CRIMINAL - FELONY
DISPOSITION:                                 AFFIRMED IN PART; REVERSED AND
                                                   RENDERED IN PART - 07/02/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**J. WILSON, P.J., FOR THE COURT:**

¶1.     Following a jury trial, Kelvin Bell was convicted of two counts of aggravated domestic violence against his girlfriend, Marilyn Ragan.  The circuit court sentenced Bell to two concurrent terms of twenty years in the custody of the Department of Corrections with five years suspended and fifteen years to serve, followed by five years of post-release supervision.  On appeal, Bell argues that the trial judge erred by: (1) granting the State's motion to amend Count II of the indictment after the close of the evidence; (2) overruling his

*Batson*[1] objections; (3) admitting testimony that Ragan went to a domestic violence shelter and certain testimony of the shelter's director; (4) allowing one police officer to opine on Ragan's credibility and allowing another officer to testify that Ragan exhibited "battered woman syndrome"; (5) allowing a physician assistant who treated Ragan to testify that Ragan's "orbital fracture [was] consistent with trauma, a direct blow hitting [her] in the eye"; (6) excluding the testimony of a witness whom Bell first disclosed on the fourth day of trial; (7) questioning Bell's expert witness about Bell's insanity defense; (8) and allowing the State to question Bell and his expert witness about Bell's history of cocaine and alcohol abuse. Finally, Bell argues that he is entitled to a new trial based on the cumulative error doctrine.

¶2.     We conclude that the trial judge erred when he allowed the State to amend Count II of the indictment after the close of the evidence. Moreover, the evidence presented at trial was insufficient to prove the offense as it was charged in Count II of the indictment. Therefore, we reverse and render Bell's conviction on Count II. However, we find no error in the trial that requires reversal of Bell's conviction on Count I, and we conclude that Bell received a fair trial on Count I. Therefore, Bell's conviction and concurrent sentence on Count I are affirmed.

## FACTS AND PROCEDURAL HISTORY

¶3.     In December 2014, Bell and Ragan had been dating and living together for several months. Two days after Christmas, Ragan's sister Minnie Montgomery asked her son-in-law,

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 82-84 (1986).

Officer Stanley Williams of the Vicksburg Police Department, to check on Ragan. Montgomery and Ragan's seventeen-year-old daughter, Kayla Neal, were concerned because they had not heard from Ragan since the previous day when she abruptly left the home that she and Bell shared. After an unsuccessful first attempt, Officer Williams was finally able to enter the home. As Officer Williams was talking to Bell, another officer saw Ragan in the bedroom. The officer saw that Ragan's face was bruised and swollen, and he asked her about her injuries. Ragan told the officer that she had fallen. However, when Officer Williams asked her about her injuries, Ragan said, "Please just get me out of here. I need to get out of here."

¶4. Officer Williams then took Ragan to the Vicksburg Police Department. Ragan told Lieutenant Penny Jones that Bell had punched her in the face. Lieutenant Jones took pictures of Ragan's face, which show bruising on her face, a swollen eye, and three small cuts. Jones also took a brief statement from Ragan and filled out a report. Jones noted that Ragan's face was scratched and her left eye was swollen, purple, and black. Jones then turned the case over to Lieutenant Beverly Prentiss.

¶5. Ragan subsequently went to Haven House, a domestic violence shelter in Vicksburg. In addition, although Ragan had initially refused treatment, she went to the emergency room on December 28, 2014. She was treated by physician assistant Daniel Silvio, who ordered a CT scan that revealed "blowout fractures of the medial left orbital wall and the left orbital floor." Bell had initially been arrested for simple assault, but Lieutenant Prentiss upgraded

3

the charge to a felony when she learned about Ragan's orbital fractures.

¶6. In May 2015, Bell was indicted for two counts of aggravated domestic violence (Count I and Count II) and one count of kidnaping (Count III). Count I alleged that Bell "attempt[ed] to cause or purposely or knowingly cause[d] serious bodily injury to . . . Ragan, with a deadly weapon or other means likely to produce death or serious bodily harm by hitting the said Marilyn Ragan in her left eye with his fists causing her to suffer an orbital fracture." Count II alleged that Bell "attempt[ed] to cause or purposely or knowingly cause[d] serious bodily injury to . . . Ragan, with a deadly weapon or other means likely to produce death or serious bodily harm by using a knife to cut her face and neck." In October 2015, Bell filed a notice of his intent to pursue an insanity defense, and the State subsequently obtained an independent psychiatric evaluation of him. Bell's case eventually proceeded to a five-day trial in August 2017.

¶7. The State called eight witnesses in its case-in-chief. Ragan testified that Bell began assaulting her while they were driving in Bell's truck. She testified that Bell became angry about the length of her recent phone call with her estranged husband, Karl Neal.[2] Bell then punched her in the face with a closed fist. He then stopped the truck, got out of the truck, and hit her in the face a second time. Ragan testified that she "felt the bone break or . . . heard it break" when Bell hit her the second time, and she "passed out a little." When she

_____

[2] Ragan and Neal were living together when she met Bell. Ragan moved out to live with Bell.

4

regained consciousness, Bell had picked her up by her hair and was shaking her. He then forced her back in the truck and resumed driving. Bell later told Ragan that he was going to kill her before the police could find her, and he pointed out where he was going to bury her body. Bell then began hitting her in the chest and stomach with his fist.

¶8.     When Bell and Ragan returned to their house, Bell told Ragan to take off all of her clothes because he did not want her to try to leave. Then Bell pulled out a knife and started "sticking" the right side of her face with the knife. Ragan testified that she "finally got [Bell] to calm down" but that she could not escape because Bell "made [her] hold him" until he went to sleep. Ragan testified that she initially told police officers that her injuries resulted from a fall because Bell and Bell's mother had urged her to say that.

¶9.     Montgomery and Kayla Neal testified about contacting authorities after they could not contact Ragan and became concerned. Officer Williams, Lieutenant Jones, and Lieutenant Prentiss also testified. Georgia Grotowitz, the director of Haven House, testified regarding her interaction with Ragan. Silvio testified about Ragan's condition and injuries when he treated her in the emergency room on December 28, 2014. He also testified as an expert in the field of "emergency medicine." Silvio testified that Ragan's "orbital fracture [was] consistent with trauma, a direct blow hitting [her] in the eye."

¶10.    Bell called six witnesses and also testified in his own defense. Bell's psychiatrist, Dr. Clyde Glenn, testified that Bell had been diagnosed with bipolar disorder. Dr. Glenn could not say that Bell was experiencing a "manic episode" on December 26, 2014. But Dr. Glenn

opined that if Bell had been experiencing "an extreme manic state" at that time, "he wouldn't necessarily understand the . . . quality of his actions or that they were wrong."

¶11.    Bell also called his daughter, two of his aunts, and a family friend. They described some of their various experiences with Bell and "behavioral problems" that he had exhibited since he was young. In general, they claimed that Bell sometimes did not understand the consequences of his actions or the difference between right and wrong. Bell's daughter testified that stress tends to make Bell's problems worse and that Ragan's unemployment had been a recent source of stress.

¶12.    Bell then testified in his own defense. Bell denied that he assaulted Ragan in any manner, claimed that Ragan injured herself when she fell in the garage, and gave a detailed account of his own version of the events of December 26-27, 2014. He testified that he and Ragan traveled to Jackson and Ridgeland, stopped at a barber shop where he worked, ate dinner at the Mediterranean Grill on Old Canton Road, and sat on a pier at the Reservoir. Bell claimed that he and Ragan extensively discussed their relationship and his desire to end the relationship. Finally, they returned home, stopping in Clinton on the way back to Vicksburg. Bell testified to the details of alleged conversations with Ragan and others on December 26. Bell stated that he slept in his "man cave" that night. He claimed that he fell asleep watching TV and awoke to the sound of Ragan running down the hall and into a bathroom. According to Bell, Ragan said that she had fallen down stairs in the garage but would be alright. Bell testified that he did not see Ragan's face that night but that her eye

6

was swollen and bruised when he saw her in the morning. Bell was adamant that he could recall the events of December 26-27 and that his detailed account was "the truth." Bell confirmed that his thought processes were intact throughout the relevant time period and that he did not have any type of manic episode on December 26 or 27.

¶13. Bell's final witness was his and Ragan's former landlord, John Tuminello. He called into question Ragan's testimony that she did not take any of Bell's belongings when she moved out of their house sometime after the alleged assault. According to Tuminello, Ragan left the house "completely empty" when she moved out.

¶14. After Bell rested, the prosecution called psychiatrist Phillip L. Scurria, M.D. as a rebuttal witness. Prior to trial, Dr. Scurria conducted an independent psychiatric examination of Bell. Dr. Scurria testified at trial as an expert in the field of psychiatry. Based on Bell's own account of the events and other information, Dr. Scurria concluded that Bell understood the nature of his actions and the difference between right and wrong at the time of the offense. Dr. Scurria further opined that Bell was not suffering from any psychotic symptoms, such as delusions or hallucinations, that would have prevented him from understanding the nature of his actions or the difference between right and wrong. Finally, the prosecution called Karl Neal, who testified briefly as a rebuttal/impeachment witness.

¶15. The jury found Bell guilty of both counts of aggravated domestic violence but acquitted him of kidnapping. The circuit court sentenced Bell to two concurrent terms of twenty years in the custody of the Department of Corrections with five years suspended and

7

fifteen years to serve, followed by five years of post-release supervision. On Count I, the court also imposed a fine of $5,000, court costs of $104, and a state assessment of $280.50. No fines, costs, or assessments were imposed on Count II. Bell filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and later filed a notice of appeal.

## ANALYSIS

### I. MOTION TO AMEND COUNT II OF THE INDICTMENT

¶16. Count II of the indictment alleged that Bell committed aggravated domestic assault in violation of Mississippi Code Annotated subsection 97-3-7(4)(a)(ii) (Rev. 2015) "by attempting to cause or purposely or knowingly caus[ing] serious bodily injury to . . . Ragan with a deadly weapon or other means likely to produce death or serious bodily harm by using a knife to cut her face and neck . . . ." However, subsection 97-3-7(4)(a)(ii) does not require proof that the defendant caused *serious* bodily injury. Instead, it provides that a person is guilty of aggravated domestic violence if he "[a]ttempts to cause or purposely of knowingly causes *bodily injury* to another with a deadly weapon or other means likely to produce death or serious bodily harm . . . ." *Id.* (emphasis added).[3]

¶17. After both sides finally rested and the evidence was closed, the State moved to amend Count II of the indictment to delete the word "serious." The State argued that the word

---

[3] Section 97-3-7(4)(a)(i) requires proof of serious bodily injury where an accused "[a]ttempts to cause . . . or causes such an injury purposely, knowingly[,] or recklessly under circumstances manifesting extreme indifference to the value of human life."

"serious" could be deleted because it was "surplusage." The trial judge allowed the amendment over Bell's objection. Bell claims the trial judge erred. We agree.

¶18. "It is fundamental that courts may amend indictments *only* to correct defects of form . . . ." *Spears v. State*, 942 So. 2d 772, 774 (¶6) (Miss. 2006) (emphasis added) (quoting *Evans v. State*, 813 So. 2d 724, 728 (¶21) (Miss. 2002)). "[D]efects of substance must be corrected by the grand jury." *Id.* (quoting *Evans*, 813 So. 2d at 728 (¶21)). "Amendments to an indictment are permissible if they do not prejudice the defendant by (1) materially altering the essential facts of the offense or (2) materially altering a defense under the original indictment." *Lee v. State*, 944 So. 2d 35, 40 (¶16) (Miss. 2006). In addition, our Supreme Court has established "the following test for analyzing an amendment to an indictment for the purpose of removing surplusage":

> (1) the removal of the surplusage must not change the substance of the offense charged; (2) the defendant must be afforded a fair opportunity to present a defense and must not be unfairly surprised; (3) the removal of the surplusage must not materially alter the essential facts of the offense; and (4) the removal of the surplusage must not alter a defense under the original indictment.

*Id.*

¶19. In granting the State's motion to amend, the trial judge relied on *Yarbrough v. State*, 996 So. 2d 804 (Miss. Ct. App. 2008). In that case, the trial judge granted the State's motion to amend the indictment "[o]n the day of trial." *Id*. at 808 (¶14). The amendment struck the word "serious" from the charge that the defendant (Yarborough) committed aggravated assault upon a law enforcement officer. *Id*. at (¶15). As a result, the State only had to prove

9

that the defendant caused bodily injury to the officer. *Id*. This Court stated that the amendment did not "change the essence of the charge" but "simply changed the extent of the injuries suffered by [the officer]." *Id*. at (¶16). In addition, this Court found that the amendment did not impair the defense because "Yarbrough's defense [was] that he was only trying to get away and did not mean to hurt [the officer]." We found that "Yarbrough's defense . . . would have been the same whether the indictment contained the word serious or not." *Id.*

¶20. *Yarbrough* is materially distinguishable from this case for two reasons. First, in *Yarborough*, the State at least moved to amend the indictment prior to the start of trial. *Id.* at 808 (¶14). Therefore, Yarbrough was able to present his defense at trial with an accurate understanding of the allegations against him. *Id.* at (¶16). In this case, in contrast, the State did not move to amend the indictment until after both sides had finally rested and the evidence was closed. Thus, Bell had *no opportunity* to adapt his defense to the amended indictment.

¶21. Second, this Court found in *Yarbrough* that Yarbrough's defense was not impaired because it "would have been the same whether the indictment contained the word serious or not." *Id.* In contrast, part of Bell's defense to Count II was the absence of proof that he caused any serious bodily injury with a knife. Bell denied that he assaulted Ragan and denied that he used a knife, but he also questioned the prosecution's witnesses about the seriousness of any alleged knife wounds. Lieutenant Prentiss characterized the alleged knife wounds as

10

"little nicks and scratches." Other witnesses testified similarly, and neither Ragan nor anyone else described the alleged knife wounds as deep or "serious." Indeed, Silvio did not even discuss the knife wounds in his testimony. And although Ragan's hospital records extensively document her orbital fracture, there is no mention of a serious knife wound. Finally, the contemporaneous photos of Ragan in evidence show only three slight, superficial cuts—one at her left eyebrow and two below her right cheek. Without minimizing the seriousness or severity of Ragan's other injuries, there is no evidence that Bell intended to cause or did cause a "serious bodily injury" with a knife. Thus, until the indictment was amended after the close of the evidence, the lack of proof of any "serious bodily injury" was a viable defense to Count II. Unlike in *Yarbrough*, we cannot say that Bell's defense was not impaired or that it "would have been the same whether the indictment contained the word serious or not." *Id.*

¶22.    In this case, the belated amendment to the indictment failed at least two requirements of the "test" laid out by the Supreme Court in *Lee*, 944 So. 2d at 40 (¶16). First, Bell was "unfairly surprised" by the amendment because it materially changed the allegations after the evidence was closed. *Id.* Second, the amendment "alter[ed] a defense under the original indictment." *Id.* Indeed, it completely eliminated a meritorious defense to Count II as it had been charged by the grand jury in the original indictment. Accordingly, we conclude that the trial judge erred by allowing the amendment to the indictment. *Id.*

¶23.    We also conclude that the Supreme Court's decision in *Richmond v. State*, 751 So. 2d

11

1042 (Miss. 1999), is relevant to our analysis of this issue. In *Richmond*, an indictment for motor vehicle theft specifically alleged that the stolen car had a value of more than $250—even though the value of the car was *not* an element of the crime under the motor vehicle theft statute. *Id.* at 1042 (¶¶8-10). Prior to trial, the State moved to amend the indictment to delete the value of the car as "surplusage," but Richmond objected, and the trial judge sustained his objection. *Id.* at 1046 (¶19). On appeal, the Supreme Court stated:

> [*T*]*he State handicapped itself through this indictment by adding an unnecessary element of proof.* [The trial judge] recognized that to allow an amendment such as striking the value of the car would be a substantive change in the indictment. [*The trial judge*] *therefore correctly required the State to prove the element of value pursuant to Richmond's objection.*

*Id.* (emphasis added).

¶24. We acknowledge that subsequent decisions have limited *Richmond*'s holding. In *Lee*, the Court stated that "[t]he trial court in *Richmond* would have committed no abuse of discretion" if it had permitted the amendment to the indictment. *Lee*, 944 So. 2d at 39 (¶11). The Court further stated that "*Richmond* does not serve as precedent for the issue of whether a motion to amend an indictment should be granted or denied." *Id.* at (¶12). "Rather, *Richmond* remains authority in cases where the indictment includes surplusage which was not removed prior to trial." *Id.*

¶25. This case involves the scenario in which *Richmond* is still binding and good law. Count II of Bell's "indictment include[d] surplusage *which was not removed prior to trial*."

12

*Id.* (emphasis added).[4] Indeed, it was not removed prior to the close of the evidence. Because "*Richmond* remains authority" in that scenario, *id.*, the trial judge should have followed *Richmond* and "required the State to prove the element of [serious bodily injury]." *Richmond*, 751 So. 2d at 1046 (¶19).

¶26. The remaining question is whether Bell may be tried again on Count II. We conclude that Bell's conviction on Count II must be reversed and rendered because the State failed to prove the offense as it was charged in the indictment. A serious bodily injury is an injury that "creates a substantial risk of death or . . . causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Johnson v. State*, 252 So. 3d 597, 600 (¶13) (Miss. Ct. App. 2017) (quoting *Fleming v. State*, 604 So. 2d 280, 292 (Miss. 1992)). For the reasons mentioned above, the State failed to prove an injury of such seriousness. The State's witnesses described Ragan's cuts as "minor cuts," "small nicks," or "little nicks and scratches," and photos show only three slight, superficial cuts. Silvio did not mention any cuts in his testimony, and Ragan's medical records do not contain any reference to any serious knife wound. No reasonable jury could have found that Ragan's minor nicks or scratches constituted "serious bodily injury."

¶27. In this case, the trial judge erred by allowing the amendment to the indictment. The trial judge should have required the State to prove the additional element of "serious bodily

---

[4] In contrast, in both *Richmond* and *Lee*—as in *Yarbrough*—the State moved to amend the indictment prior to the beginning of the trial.

injury." Had the trial judge done so, Bell would have been entitled to a directed verdict because no reasonable jury could have found beyond a reasonable doubt that Bell committed the offense as charged in Count II of the indictment. "[T]he State is not permitted a second bite at the apple" when it fails to establish an "element of proof." *White v. State*, 532 So. 2d 1207, 1222 (Miss. 1988). Accordingly, Bell's conviction on Count II of the indictment is reversed and rendered. Our remaining discussion pertains only to Count I.

## II.    *BATSON*

¶28.    During jury selection, the State exercised ten peremptory strikes, while Bell used all twelve of his peremptory strikes. Thus, the jury was selected from the first thirty-four members of the venire who were not excused or struck for cause. Nineteen of those thirty-four venire members were black. The State used nine of its ten peremptory strikes against black venire members. The jury initially selected for Bell's trial consisted of five or six black jurors and six or seven white jurors.[5]

¶29.    At the conclusion of jury selection, Bell raised a *Batson* challenge. Before the trial judge determined whether Bell had made a prima facie showing that the State exercised one or more strikes based on race, one of the prosecutors stated that, "to save time," he could "give [the court] race-neutral reasons" for the State's strikes. The State then proceeded to offer race-neutral reasons for each challenged strike. The trial judge sustained Bell's

_____

[5] The record does not show the race of one juror (number 69), who did not disclose her race on her juror information card.

14

challenge to one strike and placed that venire member on the jury.[6]  However, the judge

overruled the remainder of Bell's *Batson* challenges.  On appeal, Bell argues that the trial

judge erred by overruling his challenges with respect to jurors 59, 133, and 138.

¶30.    The use of a peremptory strike to remove a prospective juror based on race violates

the United States Constitution.  *See, e.g.*, *Foster v. Chatman*, 136 S. Ct. 1737, 1747 (2016).

A "*Batson* challenge" requires a three-step analysis:

> First, the party objecting to the peremptory strike of a potential juror must
> make a prima facie showing that race was the criterion for the strike.  Second,
> upon such a showing, the burden shifts to the State to articulate a race-neutral
> reason for excluding that particular juror.  Finally, after a race-neutral
> explanation has been offered by the prosecution, the trial court must determine
> whether the objecting party has met its burden to prove that there has been
> purposeful discrimination in the exercise of the peremptory strike, i.e., that the
> reason given was a pretext for discrimination.

*Corrothers v. State*, 148 So. 3d 278, 304-05 (¶61) (Miss. 2015) (quoting *Pitchford v. State*,

45 So. 3d 216, 224 (¶14) (Miss. 2010)).

¶31.    When—as in this case—the proponent of the strike offers race-neutral reasons before

the court finds a prima face case of discrimination, step one of the *Batson* analysis "is moot."

*H.A.S. Elec. Contractors Inc. v. Hemphill Constr. Co.*, 232 So. 3d 117, 123 (¶16) (Miss.

2016) (quoting *Hughes v. State*, 735 So. 2d 238, 250 (¶27) (Miss. 1999)).  Therefore, our

analysis of Bell's challenges focuses on steps two and three of the *Batson* analysis.

¶32.    The State meets its burden at step two "by offering a race-neutral reason for the

---

[6] Thus, the jury ultimately seated for Bell's trial included at least six black jurors
(Jurors 23, 27, 78, 108, 149, and 171).

strike." *Corrothers*, 148 So. 3d at 305 (¶62). The "reason need not be persuasive or even plausible; so long as the reasons are not inherently discriminatory, they will be deemed race-neutral." *Id.* (quoting *Batiste v. State*, 121 So. 3d 808, 848 (¶82) (Miss. 2013)). Even "fantastic," "silly," or "superstitious" reasons are sufficient to satisfy step two unless "discriminatory intent is inherent in the . . . explanation." *Purkett v. Elem*, 514 U.S. 765, 768 (1995).

¶33. At step three, "the trial court must determine whether the reason [given by the State] was a pretext for discrimination." *Corrothers*, 148 So. 3d at 305 (¶62). Our Supreme Court has stated that "certain indicia of pretext are relevant when determining whether a proffered race-neutral reason was, in fact, pretextual":

> (1) disparate treatment, that is, the presence of unchallenged jurors of the opposite race who share the characteristic given as the basis for the challenge; (2) the failure to voir dire as to the characteristic cited; (3) the characteristic cited is unrelated to the facts of the case; (4) lack of record support for the stated reason; and (5) group-based traits.

*Id.* (ellipsis omitted).

¶34. In ruling on a *Batson* challenge, "the trial court must consider all relevant circumstances." *Id.* at (¶63). "On review of the trial court's ruling on a claimed *Batson* violation, we give great deference to the trial court's findings of whether or not a peremptory challenge was race neutral." *Id.* (brackets and quotation marks omitted). "Indeed, we will not overrule a trial court on a *Batson* ruling unless the record indicates that the ruling was clearly erroneous or against the overwhelming weight of the evidence." *Id.* In addition,

16

while on-the-record findings are preferred and helpful, "the trial court's failure to articulate specific findings in its ruling on the State's race-neutral reasons is not reversible error." *Id.* at 306 (¶68) (citing *Pruitt v. State*, 986 So. 2d 940, 946 (¶¶20-21) (Miss. 2008)).

### A. Juror 59

¶35. The State struck Juror 59 because he did not complete the portion of his juror information card that asked whether he had any children. The State also noted that Juror 59 indicated that he was single, and this case involved a "victim with children . . . who is married." "A juror's indefinite answers on a juror questionnaire are a sufficient race-neutral reason for a strike." *Corrothers*, 148 So. at 308 (¶72) (Miss. 2014). Therefore, the State's explanation satisfied step two of *Batson*.

¶36. Bell argued that the State's reason was pretextual because it had accepted Juror 124, a white woman, whose juror information card did not specify whether she had any children. The State responded that it accepted Juror 124 because she had previously served on a criminal jury that "reached a guilty verdict in an arson case, which is usually a very difficult case" to prove. The State also used peremptory strikes on other prospective jurors who failed to provide the same information on their juror information cards. The trial judge overruled Bell's *Batson* challenge with respect to Juror 59, implicitly finding that the State's race-neutral reason was not pretextual. Applying our deferential standard of review, we cannot say that the trial judge's finding was clearly erroneous or against the overwhelming weight of the evidence. *Corrothers*, 148 So. 3d at 306 (¶63).

17

### B. Juror 133

¶37. The State told the court that it struck Juror 133, a black woman, because of an incomplete juror information card. Juror 133 failed to provide any information about her occupation or her employer, and she also failed to specify whether she had any children. As mentioned above, "[a] juror's indefinite answers on a juror questionnaire are a sufficient race-neutral reason for a strike." *Corrothers*, 148 So. 3d at 308 (¶72). Bell failed to make any responsive argument that the prosecutor's stated reasons were pretextual, other than to note that Juror 124 also failed to specify whether she had children. We have already discussed Juror 124 and her prior service on a criminal jury in an arson case. Bell waived any other argument concerning pretext by failing to provide it during the *Batson* hearing. *Pitchford*, 45 So. 3d at 227-28 (¶32). In any event, the trial judge did not clearly err by impliedly finding that the State's reasons were not pretextual.

### C. Juror 138

¶38. Juror 138, a black male, listed his occupation as "IT Manager." The State explained that it struck Juror 138, a black male, because:

> I employed a bunch of I.T. guys at one time. I.T. people aren't very perceptive to me. I feel - - and some of your high-level engineers and I.T. guys, they - - they require a lot of data that - - that they just don't get in trials, and they - - and they fail to apply common sense to many of the instructions. That's been my experience.

¶39. The State further explained:

> His wife is also a nurse. We do not know where she is employed as a nurse. But he has to go home to her every evening, we would suspect, and we don't

18

know what - - you know, they're not supposed to discuss the case, but that was somewhat of a flag.

¶40. The trial judge asked whether the State had "accept[ed] some nurses on the jury[,]" and the State conceded that it had. The judge then asked "why being married to a nurse would make a difference[.]" The State responded that it had been able to voir dire the nurses that it had accepted on the jury.

¶41. Bell argued that the State's reason was a pretext because the State did not strike nurses. Bell reiterates that argument on appeal, and he again points to the State's acceptance of Juror 124, a white female nurse. However, we have discussed Juror 124 and the reasons that the State accepted her above. Considering the totality of the circumstances, we cannot say that the trial judge's ruling was clearly erroneous.

¶42. On appeal, Bell also argues that the State's reason was pretextual because the State accepted Juror 143, a white female who identified herself as a "retired engineering tech." Bell argues that an "engineering tech" is comparable to an "IT Manager." This argument is waived because it was not presented to the trial judge. *See Pitchford*, 45 So. 3d at 227-28 (¶32). Moreover, Juror 143 had served on two criminal juries that returned guilty verdicts. Finally, Juror 143 did not have a college or other advanced degree. Thus, she does not appear to have been the type of "high-level engineer[]" that the prosecutor wanted to avoid.

¶43. In summary, the State provided valid, race-neutral reasons for its strikes, and there is substantial evidence that those reasons were not pretextual. Applying our deferential standard of review, we cannot say that the trial judge clearly erred by overruling Bell's

19

*Batson* challenges. *Corrothers*, 148 So. 3d at 306 (¶63).

### III. HAVEN HOUSE TESTIMONY

#### A. Testimony of Marilyn Grotowitz

¶44. Bell argues that Grotowitz, the director of Haven House, offered improper expert testimony despite not having been designated, offered, or qualified as an expert. Bell argues that Grotowitz should not have been permitted to testify that Ragan had suffered "a lot of emotional trauma," that Ragan's emotional trauma "was much more severe than normal," that Haven House provided counseling services to Ragan, and that Ragan "changed really from a victim to a strong survivor over time."

¶45. "A trial court's admission of testimony is reviewed for an abuse of discretion." *Chaupette v. State*, 136 So. 3d 1041, 1045 (¶7) (Miss. 2014). A lay witness can provide opinion testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge." M.R.E. 701. A lay witness can testify about her personal observations of another person's mental state. *United States v. Diaz*, 637 F.3d 592, 599-600 (5th Cir. 2011). "A person does not have to be a behavioral psychologist to determine if another is frightened or scared, emotions commonly experienced at one time or another by everybody." *Brown v. State*, 890 So. 2d 901, 916 (¶51) (Miss. 2004). We find no abuse of discretion in the trial judge's admission of Grotowitz's testimony that Ragan appeared to be frightened and emotionally traumatized when she came

20

to Haven House but improved over time.

## B. Testimony that Ragan Went to Haven House

¶46. In a pretrial motion in limine, Bell asked the court to prohibit the State from eliciting any testimony referencing Haven House. Bell argued that such testimony was irrelevant and unfairly prejudicial. The trial judge denied Bell's motion but did rule that the State could not introduce evidence regarding the duration of Ragan's stay at Haven House. On appeal, Bell argues that the trial judge abused his discretion. Bell also argues that such testimony was tantamount to a "victim impact statement."[7]

¶47. In general, relevant evidence is admissible. M.R.E. 402. Evidence is relevant if it has any tendency to make a material fact more or less probable. M.R.E. 401. A trial judge "may" exclude relevant evidence to avoid "unfair prejudice" but only if the "probative value" of the evidence "is *substantially outweighed* by [the] danger of . . . unfair prejudice." M.R.E. 403 (emphasis added). "Rule 403's scope is narrow," and "it is an extraordinary measure that should be used very sparingly." *Curry v. State*, 202 So. 3d 294, 298 (¶13) (Miss. Ct. App. 2016) (quotation marks omitted). Moreover, exclusion of evidence under Rule 403 "is permissive, not mandatory. That decision is committed to the broad discretion of the trial judge, and our standard of review is highly deferential." *Id.* at 298-99 (¶13) (quotation marks

---

[7] "Victim impact statements . . . describe the victim's personal characteristics, the emotional effect of the crimes on the victim's family, and the family's opinions of the crimes and the defendant." *Keller v. State*, 138 So. 3d 817, 865 (¶131) (Miss. 2014). "Victim impact evidence is admissible at sentencing, though not at the culpability phase of trial." *Havard v. State*, 928 So. 2d 771, 792 (¶37) (Miss. 2006).

and ellipsis omitted).

¶48. We cannot say that the trial judge's ruling was an abuse of discretion. Testimony that Ragan went to Haven House was factual testimony, not a "victim impact statement." Haven House was simply where Ragan went after she left the police station. In addition, Grotowitz took Ragan to the hospital on December 28 and testified as a fact witness regarding Ragan's injuries and mental state following the alleged assault. It was within the trial judge's discretion to conclude that Ragan's connection to Grotowitz (Haven House) was part of a cogent narrative of relevant events. Furthermore, this fact was not so unfairly prejudicial that it substantially outweighed the probative value of the testimony. Grotowitz acknowledged that some women come to Haven House who are not true victims of domestic violence. The trial judge did not abuse his discretion by allowing testimony that Ragan went to Haven House. Stated differently, the trial judge was not required to enter an in limine order requiring all witnesses to limit their testimony to avoid mention of that fact.

## IV. POLICE OFFICERS' TESTIMONY

¶49. Bell argues that Lieutenant Jones and Lieutenant Prentiss "impermissibly bolstered" Ragan's testimony. Although Bell combines the officers' testimony as a single issue, it is necessary to address each officer's testimony separately.

¶50. Jones testified that she "believe[d] [Ragan] was genuine in the statements that she gave" at the police station. However, any alleged error regarding Jones's testimony is procedurally barred because Bell did not object to the testimony at trial. *See, e.g.*, *Ronk v.*

22

*State*, 172 So. 3d 1112, 1134 (¶51) (Miss. 2012) ("Counsel must object contemporaneously to inadmissible evidence in order to preserve the error for appeal.").

¶51.   Prentiss testified that when she took Ragan's statement, Ragan "was really afraid" and "was shaking." Prentiss testified Ragan was reluctant to even look at a photograph of Bell, "[a]nd when she did, then she began shaking even more and quickly turned away and said, 'Yes, that's him.'" Prentiss then testified as follows:

Q.   Okay. In [thirty-five] years, seven years as an investigator, and all the domestic cases you worked --

A.   Yes.

Q.   -- I'm going to ask you just your opinion . . . from your common sense. Was . . . Marilyn Ragan scared?

A.   Out of all the domestic violence cases that I've worked, victims that I've dealt with, she is the worst -- she showed the worst signs of battered woman syndrome that I've seen in all the years I've been there.

Defense counsel objected that Lieutenant Prentiss was "not qualified to make that kind of determination," but the trial judge overruled the objection.

¶52.   The prosecutor's ultimate question—Was Ragan scared?—was not objectionable. As stated above, a lay witness can testify that a person appeared to be afraid. *Brown*, 890 So. 2d at 916 (¶51). Nonetheless, the court should have sustained Bell's objection to Prentiss's non-responsive answer because Prentiss was not offered as an expert, and there is nothing to show that she was qualified to testify about battered woman syndrome.

¶53.   However, "[t]o warrant reversal, two elements must be shown: error and prejudice to

23

the party appealing." *Gray v. State*, 799 So. 2d 53, 61 (¶30) (Miss. 2001). "A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party . . . ." M.R.E. 103(a). In other words, "[w]e will not reverse a conviction based on a harmless error." *Chaupette v. State*, 136 So. 3d 1041, 1047 (¶12) (Miss. 2014). "Error is harmless when it is trivial, formal, or merely academic, and not prejudicial to the substantial rights of the party assigning it, and where it in no way affects the final outcome of the case. . . ." *Gray*, 799 So. 2d at 61 (¶30). "[I]t is prejudicial, and ground for reversal, only when it affects the final result of the case and works adversely to a substantial right of the party assigning it." *Id.*

¶54. In this case, the vast majority of Prentiss's testimony was proper, and in context her non-responsive comment about "battered woman syndrome" should be understood only as a lay opinion that Ragan was extremely afraid, not as an expert psychological diagnosis. Prentiss did not provide any other testimony about battered woman syndrome, what it entails, or how it would be diagnosed. In context, "we cannot say that [Bell] was prejudiced by the admission of this one improper comment." *Chaupette*, 136 So. 3d at 1047 (¶12). Therefore, we conclude that the trial judge's error in overruling Bell's objection was harmless. *Id.*

## V.    SILVIO'S TESTIMONY

¶55. The trial judge allowed Silvio to testify "as an expert physician assistant . . . in the field of emergency room medicine." Silvio also testified as a fact witness regarding Ragan's injuries and his treatment of her in the hospital emergency room on December 28, 2014.

24

Over Bell's objection, the State was permitted to ask Silvio, "As a physician assistant who has worked in emergency room treatment and care . . . since 2011, is the injury suffered by Marilyn Ragan and the diagnosis of orbital fracture consistent with trauma, a direct blow hitting the eye?" Silvio answered, "Yes."

¶56.    Citing *Richardson v. Methodist Hospital of Hattiesburg Inc.*, 807 So. 2d 1244 (Miss. 2002), Bell argues that Silvio was not qualified to offer such an opinion. In *Richardson*, the Court held that a registered nurse was not qualified to testify regarding the causal link between alleged breaches in the nursing standard of care and the patient's stroke and subsequent death. *Id.* at 1247-48 (¶¶14-19). The Supreme Court held that the "cause of a stroke" is a "complex medical issue" and that the nurse "lack[ed] the requisite education and experience" to testify "as an expert to testify concerning the causal link between [the patient's] death and the alleged deviations in nursing care." *Id.* at 1247 (¶¶17, 19). Similarly, in *Vaughn v. Mississippi Baptist Medical Center*, 20 So. 3d 645 (Miss. 2009), the Court held that a nurse was not qualified to testify on the issue of "medical causation" in a malpractice case in which the patient alleged that a breach of the nursing standard of care had caused her to develop a staph infection. *Id.* at 651-52 (¶¶18-20).

¶57.    However, in *Young v. State*, 106 So. 3d 775 (Miss. 2012), the Supreme Court distinguished *Richardson* and *Vaughn*. In *Young*, a sexual assault nurse examiner testified that the injuries suffered by a sexual assault victim were "consistent with blunt penetrating trauma of the vaginal area and the anal area." *Id.* at 780 (¶19). The Court held that the nurse

was qualified to give such testimony because the nurse only testified that the victim's "injuries were *consistent with* blunt force trauma. At no point did she assert that [the] injuries were *caused by* sexual assault or penetration of the genitalia." *Id.* at 781 (¶23). The Court reasoned that such testimony did not run afoul of *Richardson* or *Vaughn* because the nurse did not "opine on medical causation"; rather, she gave only "carefully limited, noncausation testimony" that the victim's injuries were "*consistent with* blunt, penetrating trauma." *Id.* at 782-83 (¶¶27, 29).

¶58. We reach the same conclusion in this case. Silvio's qualifications are comparable to the sexual assault nurse examiner in *Young*. Silvio testified that a physician assistant is "basically" a nurse practitioner. He stated that physician assistants are "taught a little bit different under the medical model versus the nursing model in our education, but we do basically everything a nurse practitioner does under the supervision of a physician." Silvio had earned an undergraduate degree and master's degree, and he had been working in an emergency room since 2011. He testified that as a physician assistant he can "make [a] diagnosis" and "practice independently," but a "supervising physician has to review [his] chart and agree with [him] before the chart is complete." He explained: "If I initially see the patient, I will be the one basically completing the care with . . . recommendations or assistance from the M.D. that I'm working with." In addition, Silvio's testimony closely paralleled the testimony that the Supreme Court deemed permissible in *Young*. Silvio testified that Ragan's "orbital fracture [was] consistent with trauma, a direct blow hitting the

26

eye." Because the trial judge's ruling was consistent with the Supreme Court's decision in *Young*, we cannot say that the judge abused his discretion by overruling Bell's objection to Silvio's testimony. *See, e.g.*, *Thomas v. State*, 249 So. 3d 331, 339 (¶21) (Miss. 2018) ("This Court applies an abuse-of-discretion standard to the trial court's admission or exclusion of expert testimony.").

## VI. EXCLUSION OF COURTNEY TUMINELLO'S TESTIMONY

¶59. On the afternoon of the third day of trial, Bell notified the court that he intended to call John Tuminello as a witness. John and his wife, Courtney, owned the house that Ragan and Bell rented. The State objected because Bell had not disclosed John as a potential witness, and the State had no notice of John's anticipated testimony. Defense counsel stated that John would impeach Ragan's testimony that she did not take any of Bell's personal property when she moved out of the house. The trial judge ruled that John could testify after the State had an opportunity to interview him, and the State later interviewed John in preparation for his testimony the next day.

¶60. The next morning, however, Bell asked to substitute Courtney for John. Defense counsel stated that he had spoken with Courtney the night before and "she knows more" and would be "better one to testify" because "she's the one [who] actually . . . [dealt] with [Ragan] and . . . watched her move out everything and take stuff." The trial judge sustained the State's objection to the substitution but reiterated that John could testify.

¶61. Courtney subsequently testified outside the presence of the jury as a proffer. Courtney

testified that she went to the house while Ragan was in the process of moving out. Courtney stated that Ragan's injuries were less severe than she anticipated based on what Ragan had told her on the phone. Courtney also stated that Ragan took nearly everything from the house, including property that Courtney thought belonged to Bell. At the conclusion of Courtney's proffer, Bell renewed his request that she be allowed to testify. However, the judge denied Bell's request.

¶62. John then testified for the defense in the presence of the jury. John testified that he witnessed Ragan and some of her relatives moving her out of the house. John testified that Ragan left the house "completely empty" with just "a few boxes in the garage and a few clothing items" and nothing "of value left in the house." John further testified that Ragan took blinds and light bulbs that belonged to him.

¶63. Bell claims the trial judge erred by not allowing him to call Courtney as a witness. "In reviewing rulings of a trial court regarding matters of evidence, relevancy, and discovery violations, the standard of review is abuse of discretion." *Willard v. State*, 219 So. 3d 569, 574 (¶19) (Miss. Ct. App. 2017). "Our review involves determining (1) whether such a violation occurred and, if so, (2) whether the exclusion of this evidence was an appropriate remedy." *Id*. (internal quotation mark omitted). "Upon weighing all relevant factors in the case, unless there is clear error in judgment as to the sanctions imposed for violation of the discovery rule, this Court will affirm the imposed sanction." *Davis v. State*, 243 So. 3d 222, 236 n.16 (Miss. Ct. App. 2017) (quoting *McGregory v. State*, 979 So. 2d 12, 17 (¶7) (Miss.

28

Ct. App. 2008)).

¶64.  A defendant has a constitutional right to call witnesses in his favor. *See* U.S. Const. amend. VI; Miss. Const. art. 3, § 26.  But that right is subject to the defendant's obligation to disclose "all witnesses in chief which the defendant may offer at trial." MRCrP 17.3.  This includes any witnesses who are "known, or by the exercise of reasonable diligence may become known, to the defendant or defendant's counsel." *Id.*  In this case, Bell could have asked the court for permission to call Courtney when he asked to call John.  There was no reason for the additional delay in identifying her or the failure to discover her testimony until the trial was nearly over.  Moreover, by the time Courtney was disclosed, the State had already interviewed John and prepared to cross-examine him, and Courtney's proffer did not show that she had anything material to add to John's testimony.  Under these circumstances, we cannot say that the trial judge abused his discretion by ruling as he did.

¶65.  In any event, there is no reversible error unless Bell can show that he suffered prejudice because he was unable to substitute Courtney for John. *Davis*, 243 So. 3d at 237 (¶69); *Willard*, 219 So. 3d at 575 (¶26).  For the most part, Courtney's proffered testimony was the same as John's testimony.  The only notable difference was that Courtney asserted that Ragan's injuries did not appear as serious as she anticipated.  However, as the State points out, Courtney could not remember when Ragan moved out of the house, so there is no way to know how much time had passed before Courtney saw her.  The record includes photographs of Ragan's injuries, and there is no dispute that those photos were taken on

December 27, 2014—the day after the alleged assault. The evidence also includes hospital records that document Ragan's specific injuries, including her orbital fracture. Given the undisputed, contemporaneous evidence showing the extent and nature of Ragan's injuries, we fail to see how Courtney's subjective opinion about Ragan's appearance at some unknown later date is even relevant. Bell cannot possibly show that he was prejudiced by the exclusion of Courtney's testimony. Therefore, the alleged error in the exclusion of her testimony was harmless and cannot be grounds for reversal. *Davis*, 243 So. 3d at 237 (¶69).

## VII. THE TRIAL JUDGE'S QUESTIONS OF DR. GLENN

¶66. After defense counsel's redirect examination of Dr. Glenn, the trial judge briefly questioned Dr. Glenn as follows:

Q.    Dr. Glenn, when you testified that sometimes it's possible for people not to appreciate whether their actions was right or wrong -- did you say that a while ago?

A.    Yes, sir.

Q.    Okay. And so -- but if someone tried to cover up or hide their actions, whatever they are, would that be an indication that they did know it was wrong?

A.    Well, if the individual is covering and hiding, I believe then you have some understanding of what it is that you're doing and the consequences thereof.

The trial judge then asked whether either side had additional questions for Dr. Glenn in light of the court's questions, and the State briefly questioned Dr. Glenn on the same topic. The State ultimately asked, "[If] someone tells an individual to say they slipped and fell in the

30

garage, does that appear to be a cover-up or that this person knows right from wrong? Is that a possibility?" Dr. Glenn answered, "It's a possibility."

¶67. The State argues that Bell waived this issue because he did not register a contemporaneous objection to the judge's questions. However, on this issue, the Rules of Evidence provide a limited exception to the contemporaneous objection rule. "A party may object to the court's . . . examining a witness either at that time *or at the next opportunity when the jury is not present*." M.R.E. 614(c) (emphasis added).

¶68. After Dr. Glenn's testimony concluded, defense counsel attempted to call John Tuminello as his next witness. That led to a bench conference, and the judge then excused the jury from the courtroom to hear the State's objections to Tuminello's testimony. The court heard argument and ruled on that issue and then took a ten-minute recess. Before the jury returned to the courtroom, Bell made a motion for a mistrial based on the judge's questions of Dr. Glenn. Thus, Bell raised the issue before any other witness took the stand. Under these circumstances, we conclude that Bell raised the issue "at the next opportunity when the jury [was] not present." *Id.*; *see United States v. Evans*, 994 F.2d 317, 323 (7th Cir. 1993) (holding that the defendant preserved his objection to the judge's questioning of him by moving for a mistrial after he completed his testimony—"although the [motion] was made the following day, it was the first order of business after the completion of the defendant's testimony"). Therefore, the issue is preserved for appeal.

¶69. Without question, the trial judge "may examine a witness." M.R.E. 614(b). However,

the judge's questions should be "for the purpose of aiding the jury in understanding the testimony." *Brent v. State*, 929 So. 2d 952, 955 (¶7) (Miss. Ct. App. 2005) (quoting *United States v. Saenz*, 134 F.3d 697, 702 (5th Cir. 1998)). When the judge questions a witness, the judge "must use the utmost impartiality and must not indicate an opinion on the value of the testimony." *Layne v. State*, 542 So. 2d 237, 242 (Miss. 1989) (quoting Rule 5.08 of the former Uniform Criminal Rules of Trial judge Practice). Indeed, simply "by indicating or showing his attention to certain matters in the trial," the circuit court "may communicate to the jury the impression that such evidence or testimony is important or unimportant." *West v. State*, 519 So. 2d 418, 423 (Miss. 1988). "[T]he very position of a judge during trial makes each comment unusually susceptible of influencing a juror or the jury." *Id.* The Supreme Court has stated that it "will not hesitate to reverse where the trial judge displays partiality, becomes an advocate, or, in any significant way, conveys to the jury the impression that he has sided with the prosecution." *Layne*, 542 So. 2d at 242.

¶70. Here, neither Bell nor the State had questioned Dr. Glenn about whether a person's efforts to "cover up or hide" his actions may be evidence that he understood the nature of his actions or knew the difference between right and wrong. Thus, the judge's question of Dr. Glenn did not clarify or help the jury to understand Dr. Glenn's testimony. Rather, the question opened the door to new topics that Dr. Glenn had not addressed at all. Indeed, the judge's question prompted the State to ask a series of follow-up questions to attempt to connect the judge's idea to the facts of this case. Moreover, the judge's question was not

32

neutral. At the very least, the jury could have perceived it as partial. The judge's hypothetical about "someone" who "tried to cover up or hide their actions" appears to have been a clear reference to Ragan's claim (which Bell denied) that Bell and his mother urged her to lie about how she suffered her injuries. That was the connection that the State tried to establish in its follow-up questions. "[B]y indicating or showing his attention to" Ragan's claim, the judge may have "communicate[d] to the jury the impression that [Ragan's claim] important" or even credible. *West*, 519 So. 2d at 423. Accordingly, we conclude that the trial judge erred by questioning Dr. Glenn about the significance of a hypothetical person's efforts "to cover up or hide their actions."

¶71. We still must determine whether the judge's error requires reversal or was harmless.[8]

---

[8] Citing *Green v. State*, 97 Miss. 834, 838, 53 So. 415, 416 (1910), Judge Westbrooks's partial dissent argues that "the law conclusively presumes" that the judge's question influenced the jury's verdict. We respectfully disagree that *Green*'s holding applies in this case. In *Green*, one of the jurors learned that the judge had told a deputy sheriff, "We want to break this [racial epithet's] neck" (i.e., the defendant's neck). *Id.* at 835, 53 So. at 415. The judge stated that he was only "joking" and "did not mean it," and the juror testified, over objection, that the judge's statement did not influence his verdict. *Id.* However, the Supreme Court reversed the conviction. The Court held that when a judge exposes the jury to such "improper influences," "testimony will not be heard to rebut the presumption" that the judge's actions "produced the verdict." *Id.* at 838, 53 So. at 416. In contrast, the judge in this case did not use a racial epithet or comment on what the jury's verdict should be. The judge erred only by asking one question of a nonparty witness. We conclude that such an error is subject to ordinary harmless-error analysis. *See Young v. State*, 679 So. 2d 198, 204 (Miss. 1996) (distinguishing *Green* and concluding: "It is apparent from the record that the trial court overreacted when he told defense counsel to sit down upon pain of contempt. However, these comments did not deny the defendant a fundamentally fair trial. Therefore, the error was harmless." (citation omitted)); *see also Smith v. State*, 986 So. 2d 290, 300 (¶31) (Miss. 2008) ("[Only] a limited class of fundamental constitutional errors, 'structural errors,' . . . are not subject to harmless-error analysis and require automatic reversal.").

33

As we said above, "[w]e will not reverse a conviction based on a harmless error." *Chaupette*, 136 So. 3d at 1047 (¶12). "Error is harmless when it is trivial, formal, or merely academic, and not prejudicial to the substantial rights of the party assigning it, and where it in no way affects the final outcome of the case. . . ." *Gray*, 799 So. 2d at 61 (¶30). "[I]t is prejudicial, and ground for reversal, only when it affects the final result of the case and works adversely to a substantial right of the party assigning it." *Id.*

¶72.    We conclude that the trial judge's question was harmless error. The question related to Bell's insanity defense, and that defense was exceptionally weak. Dr. Glenn could only say that a person experiencing a manic episode might or might not meet the legal definition of insanity. Dr. Glenn could offer no insight as to whether Bell actually experienced such a manic episode at the time of the alleged assault. Bell then testified in his own defense. Bell denied that he assaulted Ragan in any manner, and he claimed that Ragan was injured when she fell in the garage. As discussed above, Bell gave a detailed account of his own version of the events of December 26-27, 2014. He swore that he could remember the events of those days and that his version was "the truth." On cross-examination, Bell agreed that he did not have any type of manic episode and that his thought processes were intact on the days in question. In short, nothing in Bell's testimony provided the slightest support for an insanity defense.

¶73.    Based on Bell's own testimony, it was clear to the jury that one of two things was true: either Ragan injured herself when she fell in the garage or Bell assaulted her and then

concocted an elaborate narrative to account for her injuries. However, there was no evidence that Bell was legally insane. While the trial judge erred by asking Dr. Glenn the question that he did, there was no evidence to support an insanity defense anyway. Furthermore, while the judge's question alluded to the possibility that Bell had tried to cover up his actions, that possibility was already clearly presented to the jury through Ragan's testimony. In the context of all the evidence presented during this five-day trial, we conclude that the judge's question, though error, was harmless.

## VIII.   EVIDENCE OF BELL'S COCAINE AND ALCOHOL ABUSE

¶74.    Bell argues that the State should not have been allowed to cross-examine Dr. Glenn and Bell about Bell's history of cocaine and alcohol abuse. According to Bell, those subjects were irrelevant and unfairly prejudicial because there is no evidence that Bell consumed cocaine or alcohol on December 26-27, 2014.[9]

¶75.    However, "when the defense is insanity, either general or partial, the door is thrown wide open for the admission of evidence of every act of the accused's life relevant to the issue of insanity." *Crawford v. State*, 867 So. 2d 196, 210-11 (¶51) (Miss. 2003). In *Johnson v. State*, 475 So. 2d 1136 (Miss. 1985), a murder case in which the defendant asserted an insanity defense, the Supreme Court held that the trial judge did not err by

---

[9] The State argues that Bell waived this issue by failing to make a contemporaneous objection; however, Bell raised the issue in an oral motion in limine, which the trial judge denied in a definitive ruling. Therefore, the issue is preserved. M.R.E. 103(c). Defense counsel also objected during the State's cross-examination of Bell.

allowing the State to introduce evidence that marijuana was found in the defendant's apartment. *Id.* at 1144. The Court held that evidence of the marijuana was admissible even though there was no evidence that the defendant had used marijuana recently or on the day of the murder. *Id.* The Court stated that "[w]hen the defense of insanity is raised, the entire life of the defendant is thrown open for admission into evidence." *Id.* In the present case, the evidence was not simply that Bell had used cocaine or alcohol at some point in the past; rather, alcohol abuse disorder and cocaine addiction were part of Dr. Glenn's psychiatric history and diagnosis of Bell. Given that Bell was asserting an insanity defense, the State was entitled to full cross-examination of Dr. Glenn and of Bell regarding Bell's diagnosis and mental health history. Therefore, we cannot say that the trial judge abused his discretion by allowing the State to cross-examine Dr. Glenn or Bell on this topic.

## IX. CUMULATIVE ERROR

¶76. Finally, Bell makes a brief argument that he is entitled to a new trial based on "cumulative error." Under the cumulative error doctrine, "individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Lawrence v. State*, 116 So. 3d 156, 163 (¶37) (Miss. Ct. App. 2012) (quoting *Ross v. State*, 954 So. 2d 968, 1018 (¶138) (Miss. 2007)). Based on all of the alleged errors raised in his appeal, Bell asserts that "he did not receive a fundamentally fair trial."

¶77. We have found only two relevant harmless errors: Lieutenant Prentiss's comment

36

about "battered woman syndrome" and the trial judge's question of Dr. Glenn.[10] For the reasons discussed above, we have concluded that each of those errors was harmless. We likewise conclude that those errors did not combine to "deprive[] [Bell] of a fundamentally fair trial." *Id.* The errors were isolated—a single, non-responsive answer given by one witness and a single improper question of another witness. In the context of all the evidence presented through seventeen witnesses over the course of a five-day trial, we cannot say that these two isolated errors rendered the trial as a whole fundamentally unfair. "A defendant is entitled to a fair trial but not a perfect one, for there are no perfect trials." *Brown v. United States*, 411 U.S. 223, 231-32 (1973) (brackets and quotation marks omitted). Bell received a fair trial as to Count I. Therefore, we affirm his conviction on Count I.

**CONCLUSION**

¶78. The State should not have been allowed to amend Count II of the indictment after both sides had rested and the evidence was closed. Furthermore, the evidence presented at Bell's trial was insufficient to convict him of Count II as charged in the indictment. Therefore, Bell's conviction on Count II is reversed and rendered.

¶79. However, as to Count I, Bell received a fair trial, and he has identified no error or errors that require a new trial. Therefore, Bell's conviction on Count I is affirmed.[11]

---

[10] The error in allowing the State to amend Count II of the indictment after the close of the evidence requires us to reverse and render Bell's conviction on Count II, but it had no effect on the fairness of Bell's trial or his conviction on Count I.

[11] As noted above, Bell was ordered to pay a fine, court costs, and an assessment as part of his sentence on Count I but not on Count II. Therefore, our decision has no effect on

¶80.   **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**CARLTON, P.J., GREENLEE, TINDELL AND C. WILSON, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, C.J., AND McDONALD, J.; McCARTY, J., JOINS IN PART. LAWRENCE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY McCARTY, J.**

**WESTBROOKS, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶81.   I agree that the circuit court erred when it allowed the prosecution to amend Count II after all of the evidence had been presented. I also agree with most of the majority opinion's conclusions regarding the remaining issues as they pertain to Count I.[12] But with utmost respect for the majority opinion, I must conclude that the circuit court erred when the trial judge questioned Dr. Glenn in a manner that prejudiced Bell's insanity defense and gave the prosecution a chance to ask follow-up questions that it neglected to ask during its initial cross-examination. I would also find that the circuit court erred when it allowed Lieutenant Prentiss to offer expert testimony when she had only been called as a lay witness. Consequently, I would reverse Bell's conviction in Count I and remand that charge for a new trial.

**I.      Judicial Examination of Dr. Glenn**

---

the fine, court costs, or assessment imposed by the circuit court.

[12] Based on the difficulty in conducting a deferential review of implicit conclusions that proffered race-neutral reasons for exercising peremptory challenges are not pretexts for racial or gender discrimination, I encourage circuit courts to make more detailed findings beyond simply denying a *Batson* challenge.

38

¶82.    The majority opinion finds that the trial judge questioned Dr. Glenn in a manner that the jury could have perceived as partial toward the prosecution.  But the majority opinion goes on to find that the error was harmless because Bell's insanity defense was weak and Bell's subsequent testimony contradicted his insanity defense.  I would find that the error is reversible.

¶83.    For more than a century, the Mississippi Supreme Court has recognized that a circuit judge must be cautious to avoid creating the appearance that he favors one party over the other:

> It is a matter of common knowledge that jurors, as well as officers in attendance upon court, are very susceptible to the influence of the judge.  The sheriff and his deputies, as a rule, are anxious to do his bidding; and jurors watch closely his conduct, and give attention to his language, that they may, if possible, ascertain his leaning to one side or the other, which, if known, often largely influences their verdict.  He cannot be too careful and guarded in language and conduct in the presence of the jury, to avoid prejudice to either party.  The court will not stop to inquire whether the jury was actually influenced by the conduct of the judge.  All the authorities hold that if they were exposed to improper influences, which might have produced the verdict, the presumption of law is against its purity; and testimony will not be heard to rebut this presumption.  It is a conclusive presumption.

*Green v. State*, 97 Miss. 834, 53 So. 415, 416 (1910).

> The great danger, particularly in a criminal case, is that the weight and dignity of the court accompanies each question or comment, although not so intended by the judge, and are very likely to be interpreted by the jury as the court's [dis]approval of the witness and h[is] testimony, . . . thus diverting the jurors' attention from their responsibility of deciding the case from the evidence, untainted, as heard by them from the witness stand.

*Thompson v. State*, 468 So. 2d 852, 854 (Miss. 1985).

39

¶84. When the trial judge questioned Dr. Glenn, he created the impression that he thought Bell knew right from wrong because Bell tried to conceal his conduct. The circuit court's clear error does not become harmless simply because Bell subsequently chose to testify. *See Robinson v. State*, 35 So. 3d 501, 507 (¶18) (Miss. 2010). And as noted above, the law conclusively presumes that the jury's verdict resulted from the trial judge's improper influence. *Green*, 97 Miss. 834, 53 So. at 416.[13] I must find that the circuit court committed reversible error when it essentially impeached Bell's expert witness and gave the prosecution another bite at a more effective cross-examination.

## II. Lieutenant Prentiss's Improper Testimony

¶85. I also respectfully disagree with the majority opinion's conclusion that the circuit court committed harmless error when it overruled defense counsel's objection to Lieutenant Prentiss's improper testimony beyond her qualifications as a lay witness. The prosecutor asked Lieutenant whether Ragan was scared, and the question called for Lieutenant Prentiss to rely on her common sense and her substantial experience as a law-enforcement officer.

---

[13] I agree that the circumstances in this case are unquestionably less egregious than those in *Green*, but the supreme court did not limit its conclusion to a circuit court's use of racial epithets or explicit suggestions regarding the ultimate outcome of the case. Instead, the supreme court held that the exposure to the circuit court's improper influence is outcome determinative—not "whether the jury was *actually* influenced by the conduct of the judge." *Green*, 97 Miss. 834, 53 So. at 416 (emphasis added). Here, the jury was exposed to the trial judge's influence when he questioned Dr. Glenn in a manner suggesting that the trial judge did not believe Bell's insanity defense. Thus, "the [conclusive] presumption of law is against [the verdict's] purity . . . ." *Id.* Furthermore, this case is not like *Young*, 679 So. 2d at 204, in which a trial judge expressed irritation with defense counsel without otherwise indicating that the jury should not believe the defendant.

"By definition, . . . a question [that calls for one's reliance on her experience as a law-enforcement officer] does not call for a lay opinion." *Crump v. State*, 237 So. 3d 808, 818 (¶32) (Miss. Ct. App. 2017) (citing *Seal v. Miller*, 605 So. 2d 240, 244 (Miss. 1992)). "[A]s a lay witness, [Lieutenant Prentiss] could not express an opinion that would require calling upon experience or expertise beyond that of an average, randomly selected adult." *Id*. at 817 (¶30) (internal quotation mark omitted). A lay witness's opinion testimony cannot be "based on scientific, technical, or other specialized knowledge . . . ." M.R.E. 701(c).

¶86.    True enough, "[a] person does not have to be a behavioral psychologist to determine if another is frightened or scared . . . ." *Brown*, 890 So. 2d at 916 (¶51). But Lieutenant Prentiss's response went beyond the prosecutor's question. Earlier, Lieutenant Prentiss had testified that she had worked domestic-violence cases for seven years of her thirty-five year career, and on average she handled "about 600 and 650 [domestic-violence cases] per year." That testimony is clearly rooted to her specialized knowledge as a law-enforcement officer. Thus, Lieutenant Prentiss essentially testified that out of approximately 4,200 to 4,550 domestic-violence cases that she had worked on, Ragan "showed the worst signs of battered woman syndrome that" Lieutenant Prentiss had ever seen.

¶87.    "[B]ecause the public hold[s] police officers in great trust, the potential harm to the objecting party requires reversal where a police officer gives expert testimony without first being qualified as such." *Kirk v. State*, 160 So. 3d 685, 693 (¶19) (Miss. 2015) (quoting *Roberts v. Grafe Auto Co.*, 701 So. 2d 1093, 1099 (Miss. 1997)). Although the supreme

41

court has not reversed its prior decisions holding that harmless error resulted where a lay witness offered improper testimony that was cumulative because an expert witness testified to the same effect,[14] no expert witness provided testimony that made Lieutenant Prentiss's cumulative. Because Lieutenant Prentiss had not been called or qualified as an expert witness, I would find that the circuit court erred when it overruled the prosecution's objection and allowed Lieutenant Prentiss to offer opinion testimony based on her specialized knowledge and experience as a law-enforcement officer.

**BARNES, C.J., AND McDONALD, J., JOIN THIS OPINION. McCARTY, J., JOINS THIS OPINION IN PART.**

**LAWRENCE, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶88. I agree with the majority that the circuit court committed error by overruling the objection to Lieutenant Prentiss's testimony at trial and that the ruling was harmless error. Further, I agree with the majority that it was harmless error when the judge asked a question of the Defense's expert witness in front of the jury. I would find, however, that the judge had the authority to ask the question under the Mississippi Rules of Evidence. Finally, I respectfully dissent from the majority on the issue reversing the conviction when the judge allowed the State to amend the indictment at the close of evidence. I do not think the deletion of the word "serious" from the indictment was reversible error. Accordingly, I

---

[14] *See Le v. State*, 913 So. 2d 913, 937 (¶80) (Miss. 2005), *overruled on other grounds by Bonds v. State*, 138 So. 3d 914, 919 (¶13) (Miss. 2014); *Walker v. State*, 740 So. 2d 873, 882-83 (¶¶34-35) (Miss. 1999), *disagreed with on other grounds* by *Dilworth v. State*, 909 So. 2d 731, 735 n.4 (Miss. 2005); *Whittington v. State*, 523 So. 2d 966, 974-75 (Miss. 1988).

concur in part and respectfully dissent in part from the majority opinion.

## I. The Amendment of the Indictment

¶89.    In its original form, Count II of the indictment against Bell listed one word too many. The indictment listed "serious bodily injury" instead of the statutorily required "bodily injury" because a deadly weapon was used. When the prosecution moved to amend the indictment against Bell, the only change was the removal of the word "serious." That change conformed the indictment to the law.[15]

¶90.    The defendant objected to the motion. The judge asked defense counsel if he believed the change was material. The defense responded that the deletion of the word amounted to a "material change." To determine if a change was material, the supreme court has instructed this Court to determine if the defendant was prejudiced "thereby in his defense on the merits." *Gillespie v. State*, 221 Miss. 116, 118, 72 So. 2d 245, 247 (1954).

¶91.    Rule 14.4(a) of the Mississippi Rules of Criminal Procedure provides that an amendment "may be allowed only if the defendant is afforded a fair opportunity to present

---

[15] The State moved to amend the indictment at the close of the evidence *before* jury instructions. How the State could not have discovered the necessity of an amendment before trial is not explained. It should have been. If the State intentionally delayed amending the indictment to obtain an advantage, or was dilatory, or prevented a defense, or prejudiced the defendant, I would agree that a reversal was necessary. There is simply no evidence of that in the record. Further, it was not argued or ever offered by the defense that the State intentionally delayed amending the indictment. The defense only argued at trial that it was a "material" change. The better practice has been addressed by this Court and the Mississippi Supreme Court numerous times. Indictments should track the statute and comply with the Mississippi Rules of Criminal Procedure.

a defense and is not unfairly surprised." What the appellant never explains is how a correct statement of the law can ever be a surprise to a defendant. We are all presumed to know the law. This State's jurisprudence is deeply rooted in the principle that "ignorance of the law excuses no one," and "every person is charged with knowledge of the law." *Hoskins v. Howard*, 214 Miss. 481, 59 So. 2d 263, 269 (1952). While the motion may have been made at the close of the evidence,[16] the defense still had the exact same defense it had throughout the trial. Bell's defense was twofold. His first argument was that he did not do the crimes with which he was charged. Second, he was criminally not liable for the acts he was alleged to have committed as he was insane at the time those acts occurred. Bell testified at trial that the entire episode was "fabricated" and that he was not guilty. Bell called numerous witnesses, who essentially testified that the defendant suffered from "episodes" and bouts of aggression where he would act inappropriately and, for example, would express his anger by punching out walls. The State even introduced evidence of the extensive medical records of the victim, which were unopposed by the defendant. Further, the medical providers testified at trial and were cross examined by Bell. Their testimony was based on their observations, treatment, and care of the victim. Deleting the word "serious" had absolutely no effect on the testimony of those providers.

---

[16] In *Goodin v. State*, the Mississippi Supreme Court held that "[a]llowing an amendment to the indictment after the close of evidence does not, standing alone, constitute reversible error. An indictment may be amended without action of the grand jury if the amendment is one of form and not of substance." 977 So. 2d 338, 340-41 (¶11) (Miss. 2008) (citing *Spann v. State*, 771 So. 2d 883, 898 (¶44) (Miss. 2000)).

¶92.   The simple deletion of the word "serious" from the indictment did not deprive Bell of his defense that he was innocent and, in the contradicting alternative, that he was insane. His twofold defense was still available.  Respectfully, it appears that Bell's actual argument on appeal is that he was deprived from arguing a technicality that could allow him to escape criminal liability.   Stated more plainly, Bell wanted to use the defense of showing the State could not prove "serious bodily injury" beyond a reasonable doubt, and due to that technicality he should be found not guilty.  The only problem with that technical defense is that it is not the law, nor was it argued at trial.  The law only requires a showing of "bodily injury" when a deadly weapon is used.  Bell still had both defenses he choose to use at trial: that he did not do the crime, and that he was insane.  Bell put on the same evidence for both of those defenses regardless if "serious" was included in the indictment or not and regardless of when it was deleted.

¶93.   The bigger problem with the majority's holding is that the trial judge relied on this Court's opinion in *Yarbrough* and found that the removal of the word "serious" from the indictment did not "materially alter facts" that changed the face of the indictment.  In fact, the judge stated his decision as follows:

> THE COURT:      [. . .] It looks like the case that's most on point would be the *Yarbrough* case, and that case clearly states that if all you're going to be doing is removing the word "serious" from bodily injury that it does not change the essence of the indictment.  So I will allow the amendment.

In *Yarbrough*, this Court was presented with the exact same scenario over a decade ago.

There, this Court found that this type of amendment did not amount to a material change. *Yarbrough v. State*, 996 So. 2d 804, 808 (¶¶15-16) (Miss. Ct. App. 2008). In fact, similar to the amendment granted in this case, this Court in *Yarbrough* held that an amendment removing the word "serious" from an indictment of aggravated assault under Mississippi Code Annotated section 97-3-7 was a change in form, not substance. This Court stated that "[t]he amendment simply changed the extent of the injuries suffered by [the victim]." *Yarbrough*, 996 So. 2d at 808 (¶16). Further and more on point, this Court noted we "fail to see how Yarbrough's defense changed by the removal of the word serious from the indictment." *Id*. Finally and equally on point, this Court found that the defense would have been the same "whether the indictment contained the word serious or not." *Id*. That has been the law in this State since 2008. In fact, the language of *Yargbrough* is instructive. The opinion stated: "[A]mending the indictment to reflect that Yarbrough caused or attempted to cause bodily injury, rather than serious bodily injury, does not change the essence of the charge: aggravated assault upon a law enforcement officer." *Id*. Here, the same can be said: "Amending the indictment to reflect that [Bell] caused or attempted to cause bodily injury, rather than serious bodily injury, does not change the essence of the charge: aggravated assault [by the use of a deadly weapon]." *Id*.

¶94.    Here, the circuit court relied on this Court's pronouncement in *Yarbrough*. Now, it appears we are changing the rules and retroactively imputing to the trial judge that change of opinion when it would be impossible for the circuit court to anticipate such a change.

46

Contrary to the *Yarbrough* ruling, we find now that the trial judge abused his discretion when he approved the same exact amendment that this Court authorized in *Yarbrough*. The jurisprudence of this State should not be a moving target.

¶95.    *Yarbrough* is the law and this Court should affirm the circuit courts according to precedent. Because if this Court reverses a trial judge for abusing his discretion when that judge relied on this Court's decision in *Yarbrough*, the least we can do is admit our error in *Yarbrough* and overrule it in an effort to give clear guidance to trial judges. But the majority does not seek to overrule *Yarbrough*. Instead, the majority seeks to distinguish *Yarbrough* from the instant case. As it stands now, we have essentially left the trial courts in this State in a precarious situation in trying to determine when an amendment should be allow and when it should not.

¶96.    Further, this Court stated in *Yarbrough*, as clearly as it could, that the defense would have been the same "whether the indictment contained the word serious or not." As stated previously, the two defenses offered by Bell were available before the motion was made and the word "serious" was deleted from the indictment. I respectfully disagree that the trial judge's reliance on our holding in *Yarbrough* can be considered an abuse of discretion today when in 2008 this Court, under a very similar occurrence of facts, said it was not. Because the defendant can never be surprised by a correct statement of the law, and because he was still able to present his same defense—namely that he did not commit the act charged and if he did he was insane at the time—I believe the amendment that deleted the surplusage word

47

in the indictment was not prejudicial to the defense and was simply a matter of form. Accordingly, I would affirm the circuit court's decision regarding Count II of the indictment and affirm the conviction.

## II. The Trial Judge's Question

¶97. I disagree with the majority's finding that the trial judge erred when he asked a question of the defense's expert[17] but that the error was harmless. I would find that it was not error at all. The defense, in a attempt to offer a insanity defense, called Dr. Glenn. At trial, the following exchange occurred between the trial judge and Dr. Glenn:

Q. Okay. And so – but if someone tried to cover up or hide their actions, whatever they are, would that be an indication that they did know it was wrong?

A. Well, if the individual is covering and hiding, I believe then you have some understanding of what it is that you're doing and the consequences thereof.

Pursuant to Rule 614 of the Mississippi Rules of Evidence, the judge could ask that question. The Mississippi Supreme Court has held that it "will not hesitate to reverse where the trial judge displays partiality, becomes an advocate, or, in any significant way, conveys to the jury the impression that he has sided with the prosecution." *Layne v. State*, 542 So. 2d 237, 242 (Miss. 1989). I disagree with the majority that the trial judge erred when he asked the

---

[17] It is certainly the safer practice for trial judges to not engage in actions before the jury that litigants can use to question the court's impartiality. Further, lawyers know the case far better than the trial judge, and the court should be careful in taking actions like asking questions of a witness that could interfere with a lawyer's strategic questioning or not. The better practice may be the often lawyer-quoted adage: "let the lawyers try the case."

question of defense's expert. I would find that the question was neutral. It was crucial evidence as to insanity, but no party asked the question either on direct or cross examination. Since Rule 614 allows the judge to ask questions, I would find that the judge did not err when he asked the question, which was not intended to assist either party but only asked in an effort to assist the jury.

¶98. I do agree that the expert's answer did have an adverse effect on the defense's insanity defense. While the question was neutral, the response given by the defense's expert was certainly not. I find it important to note, however, that the trial judge did not know what answer the witness would give. The expert could have answered the exact opposite, or offered a case in his professional life proving the contrary. I agree that a judge's questions should not appear to favor one side and, in essence, should appear neutral. I would find that the judge's question was indeed neutral. In my view, the defense appears to be more upset over the response their expert gave to the question—not that the judge asked it to begin with. Without more, I would find that is not a valid reason to reverse a jury conviction.

¶99. That distinction aside, I agree with Judge Wilson that the insanity defense "was exceptionally weak." I would find the expert's truthful response of the expert to a legitimate question—even though asked by the court—did not "result in a manifest miscarriage of justice." *Williams v. State,* 134 So. 3d 732, 736 (¶15) (Miss. 2014).

### III. Lieutenant Prentiss's Testimony

¶100. Finally, I agree with the majority that the testimony of Lieutenant Prentiss was

49

harmless in context of the whole of the evidence. While I agree with the majority, I write separately to express my concerns for run-away police-opinion testimony. The following scenario unfolded directly in front of the jury:

> Q.       Okay. In 35 years, seven years as an investigator, and all the domestic violence case you worked –
>
> A.       Yes.
>
> Q.       – I'm going to ask you just your opinion on – out of – from your common sense. Was that — was [Ragan] scared?
>
> A.       Out of all the domestic violence cases that I've worked, victims that I've dealt with, **she is the worst – she showed the worst signs of battered woman syndrome that I've seen in all the years I've been there.**
>
> . . . .
>
> MR. KLEIN:       We're going to object, Your Honor. That's a – that's a psychological, psychiatric evaluation. She's not qualified to make that kind of determination, and we would ask the jury – we'd ask the Court to ask the jury to disregard and to strike that portion of her testimony. That's for a psychiatrist or psychologist to make.
>
> THE COURT:       Overruled.

(Emphasis added.) By stating the victim "showed the worst signs" of battered woman syndrome," the officer was essentially saying that the defendant was guilty. That is error. It should be noted that, had the judge sustained the objection and instructed the jury to disregard the testimony, any error or prejudice to the defendant would certainly be harmless. But here the judge overruled the objection which effectively allowed the opinion testimony

50

of the officer to be introduced as substantive evidence. That opinion was improperly bolstered by her testimony that she averaged six hundred to six hundred and fifty cases of domestic violence a year in the last seven years. An officer's testimony should be based on his or her investigation, observations during that investigation and any evidence collected. An officer's testimony should not include opinions as to the guilt or innocence of the accused. That is reserved for the jury. "[T]he question of guilt or innocence of the crime charged should be received by the jury unhampered by any suggestion or insinuation . . . ." *Smith v. State*, 457 So. 2d 327, 336 (Miss. 1984) (citing *Tudor v. State*, 299 So. 2d 682, 685-86 (Miss. 1974)).

¶101. It is important to consider that the State did not ask for, or seek out, the opinion the officer gave. The State only asked for the officer's observations as to whether the victim appeared scared upon her arrival to the scene. While the officer should have answered only the question asked and not free-lanced into impermissible area of testimony and the court should have sustained the objection when made, it appears clear to me that such a small molehill in the mountain of evidence offered into evidence at trial would have no effect on a reasonable juror. I agree with the majority that any error was harmless. I must disagree, however, that the circuit court following the law set forth in *Yarbrough* constitutes reversible error.

**McCARTY, J., JOINS THIS OPINION IN PART.**